IN THE SUPREME COURT OF TENNESSEE
AT JACKSON

**FILED**

**June 28, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

ANTHONY P. GUILIANO )
)
    Plaintiff/Appellant )
)
v. )
)
CLEO, INC. )
)
    Defendant/Appellee )
)
)

**FOR PUBLICATION**

**FILED:  June 28, 1999**

SHELBY CIRCUIT

Hon. James E. Swearengen

02S01-9801-CV-00002

For the Petitioner:

Frank L. Watson
Waring Cox, P.L.C.
Memphis, Tennessee

For the Respondent:

James H. Stock, Jr.,
Christopher E. Moore
Weintraub, Stock, Bennett,
Grisham & Underwood, P.C.
Memphis, Tennessee

# OPINION

Court of Appeals Reversed;
Trial Court Affirmed

Barker, J.

**OPINION**

We granted this appeal to address the recovery of liquidated damages where a plaintiff/employee alleges that he has been constructively terminated from his employment. The trial court in this case granted summary judgment in favor of the appellant, Anthony P. Guiliano, based upon a finding that he had been constructively terminated from his employment and that he was entitled to recover the remainder of his salary under Paragraph 9 of his employment contract.[1] The Court of Appeals agreed that the appellant had been constructively terminated from his employment, but concluded that he was not entitled to any recovery. The intermediate court held that Paragraph 9 of the contract was a liquidated damages provision that imposed a penalty on the appellee, Cleo, Inc., (Cleo).

Both parties request this Court to determine whether Paragraph 9 of the employment contract contemplates the payment of severance pay or liquidated damages. For the reasons that follow, we conclude that the sums payable pursuant to Paragraph 9 are liquidated damages in the event that Cleo terminated appellant's employment without cause, effectively breaching the contract.

We affirm the trial court's grant of summary judgment for the appellant on the issue of constructive termination. In addition, because we find that the liquidated damages provision was a reasonable estimation of employee damages at the time the parties entered into the contract, we conclude that the appellant is entitled to recover the full amount stipulated in that provision. The judgment of the Court of Appeals is reversed, and the trial court's grant of summary judgment for the appellant is affirmed.

---

[1] The trial court awarded $90,125 in back salary plus $14,296.54 in prejudgment interest, for a total award of $104,421.54. The record is unclear whether the trial court treated that recovery as severance pay or liquidated damages.

2

# BACKGROUND

The essential facts in this case are undisputed. The appellant had been employed as a director of marketing at Cleo[2] for approximately one year when he entered into a written employment contract with the company. The contract was in the form of a letter sent by Michael Pietrangelo who was then the President and Chief Executive Officer of Cleo. The letter agreement stated in pertinent part:

> Cleo Inc. and I are very pleased that you have agreed to serve as Vice President, Marketing of Cleo Inc. (the "Company"), a wholly owned subsidiary of Gibson Greetings, Inc. As Vice President, Marketing you will report to the President, and perform those functions currently assigned, which functions and responsibilities can be changed at the discretion of the Company. The following terms and conditions will govern your service to the Company:
>
> 1. You will serve the Company on a full-time basis as a senior executive employee, and the company will employ you as such, for a period of three years commencing November 1, 1992 and ending October 31, 1995 unless you are terminated at an earlier date pursuant to Paragraphs 6, 7, or 9 of this Agreement. Your annual salary will be $103, 000, which amount will be reviewed every fifteen months and which may be adjusted from time to time by the Company throughout the term of this Agreement in accordance with the Company's salary administration program. No later than six months prior to expiration of the original term, or any renewal term, of this Agreement, it will be reviewed by the Company for the purpose of deciding whether or not it will be renewed upon its expiration. You will be notified of a decision not to renew. If you are not notified of a decision not to renew, the Agreement will automatically renew from year to year.
>
> . . . .
>
> 6. In the event you are unable to perform your duties hereunder due to illness or other incapacity, which incapacity continues for more than six consecutive or nonconsecutive months in any twelve-month period, the Company shall have the right, on not less than 30 days written notice to you, to terminate this Agreement. . . .
>
> 7. In the event you voluntarily terminate your employment during the term of this Agreement, or if the Company terminates this Agreement and your employment for cause, your right to all compensation hereunder shall cease as of the date of termination. As used in this Agreement, "cause" shall mean dishonesty, gross negligence, or willful misconduct in the performance of your duties or a willful or material

---

[2]At all times relevant to this case, Cleo was a wholly owned subsidiary of Gibson Greetings, Inc.

3

breach of this Agreement. Termination of employment shall terminate this Agreement with the exception of the provisions of Paragraphs 8, 9, 10, and 12.

8.      Also in the event you voluntarily terminate your employment hereunder, or in the event the Company terminates this Agreement and your employment for cause, you agree that for a period of two years after such termination, you will not compete, directly or indirectly, with the Company or with any division, subsidiary, or affiliate of the Company or participate as a director, officer, employee, consultant, advisor, partner, or joint venturer in any business engaged in the manufacture or sale of greeting cards, gift wrap, or other products produced by the Company, or any division, subsidiary, or affiliate of the Company, without the Company's prior written consent.

9.      In the event the Company terminates this Agreement and your employment without cause, you shall continue to be paid your then current salary from the date of termination through October 31, 1995.

In 1994, Cleo experienced several personnel changes in its upper management. Jack Rohrbach replaced Mr. Pietrangelo as the company's President and Chief Executive Officer and Marc English was later hired as the Senior Vice President of Marketing and "Creative." Mr. Rohrbach stated in his deposition that he began observing the appellant's work performance when he took over as the company president. Based upon his observations, he opined that the appellant had a poor work relationship with his peers and subordinates and that the appellant was not leading the marketing department in a direction best suited for the company. Mr. Rohrbach stated that he hired Mr. English as the new marketing Vice President because Mr. English had more industry experience and a successful track record.

In the Fall of 1994, the appellant received a series of letters from Mr. Rohrbach and Mr. English that diminished his employment responsibilities at Cleo. The first letter, dated September 13, 1994, informed the appellant that his employment contract would not be renewed after its expiration on October 31, 1995. Approximately two weeks later, the appellant received a second letter signed by Mr. Rohrbach that stated in pertinent part:

4

Effective today and until October 31, 1995, you are relieved of your duties as Vice President Marketing of Cleo Inc. and shall be responsible for such assignments as may be given to you by the President of the Company. During this period, you will remain an employee of the Company and the Company will continue to honor its obligations to you under your employment agreement.

However, you are specifically advised that you shall have no authority to bind, represent or speak for the Company in any manner except as may be stated in writing by the President of the Company.

For all future assignments, you shall be based out of your home.

Should you accept other employment prior to October 31, 1995, all benefits under your employment agreement shall immediately cease. Also, please take note of the confidentiality and non-compete provisions of your employment agreement.

We will be in touch when an appropriate assignment becomes available. In the meantime, should you have any questions or comments, please do not hesitate to contact me.

In November, 1994, the appellant received two additional letters from Cleo informing him that he was no longer authorized to use company credit cards and that he was to return the company cards in his possession. In addition, he was informed that Cleo would no longer answer a telephone line for him. All telephone calls for the appellant were to be screened for personal or business, with the personal calls being directed to appellant's home. Cleo allowed the appellant to retrieve the personal telephone numbers from his office rolodex, but all business numbers were kept exclusively by Cleo as company property.

Following the letter of September 28, 1994, the appellant stayed at his home for three months without receiving a work assignment from Cleo. During that time, Mr. English moved into appellant's old office and assumed the marketing responsibilities previously handled by the appellant.[3] On December 12, 1994, the appellant accepted new employment at Wang's International, Inc. with a starting salary of $110,000 per

---

[3] Mr. Rohrbach stated in his deposition that Mr. English took on other responsibilities at Cleo in addition to those previously handled by the appellant.

year. Cleo kept the appellant on the company payroll at $103,000 per year until he began his new employment.

The appellant filed suit against Cleo on January 26, 1995, claiming that the company had constructively terminated his employment without cause and that he was entitled to the remainder of his salary under Paragraph 9 of the employment contract. Cleo responded that its treatment of the appellant did not constitute a termination of his employment, but that even if it did, the provision in Paragraph 9 was an unenforceable penalty. Both parties filed motions for summary judgment. After a hearing, the trial court granted summary judgment to the appellant, awarding him $90,125 in salary remaining under his employment contract plus $14,296.54 in prejudgment interest.

On appeal by Cleo, the Court of Appeals affirmed the trial court's conclusion that the appellant was constructively terminated from his employment, but reversed the award of damages. The intermediate court interpreted Paragraph 9 of the employment contract as a provision for liquidated damages because it called "for payment of a sum certain in the event of a certain occasion." Finding no evidence in the record of actual damages suffered by appellant, the court concluded that enforcement of the liquidated damages provision would impose an unlawful penalty against Cleo.

The appellant requests this Court to reverse the Court of Appeals and to reinstate the judgment of the trial court. His contention in this appeal is that Cleo constructively terminated his employment when it removed his title of Vice President of Marketing and sent him home for three months without any further assignments. However, in contrast to his argument in the courts below, the appellant now claims that Cleo had a right to terminate his employment, as it did in this case, without

6

breaching the contract. He contends that, regardless of the issue of breach, he is entitled to recover severance pay under Paragraph 9 of the employment contract.

## STANDARD OF REVIEW

The standards governing an appellate court's review of a motion for summary judgment are well settled. Summary judgment is appropriate only where the moving party demonstrates that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993); Tenn. R. Civ. P. 56.03. We review the summary judgment motion as a question of law in which our inquiry is *de novo* without a presumption of correctness. Finister v. Humboldt Gen. Hosp., Inc., 970 S.W.2d 435, 437 (Tenn. 1998); Robinson v. Omer, 952 S.W.2d 423, 426 (Tenn. 1997). We must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. Byrd, 847 S.W.2d at 210-11. If both the facts and conclusions to be drawn therefrom permit a reasonable person to reach only one conclusion, then summary judgment is appropriate. Robinson, 952 S.W.2d at 426; Bains v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

## DISCUSSION

### I.

We shall first address whether summary judgment was appropriate on the question of constructive termination. Initially, we note that the issue of constructive termination in this case is distinguishable from cases where an at-will employee claims constructive discharge based upon a hostile work environment, discrimination, or

7

some non-feasance on the part of the employer.  See Phillips v. Interstate Hotels Corp., 974 S.W.2d 680 (Tenn. 1998); Campbell v. Florida Steel Corp., 919 S.W.2d 26 (Tenn. 1996).  The appellant contends that Cleo removed his job title and all work responsibilities, effectively terminating his employment, without officially or formally ending the employment agreement.  We view this issue strictly as one of breach of contract and conclude that the evidence clearly establishes that Cleo effectively terminated appellant's employment without cause, thereby breaching the contract.

Both the appellant and Cleo have agreed on the facts leading up to appellant's change of employment.  Cleo contends, however, that it had a right to alter the appellant's work responsibilities under the employment contract, as it did in this case, without causing a termination.  In support of that contention, Cleo relies on evidence that it allowed the appellant to stay on the company payroll as a senior executive employee until he obtained new employment.

The resolution of this dispute centers on the construction of the employment contract.  Cleo refers to that portion of the contract which states:

> Cleo Inc. and I are very pleased that you have agreed to serve as Vice President, Marketing of Cleo Inc. ...  As Vice President, Marketing you will report to the President, and perform those functions currently assigned, which functions and responsibilities can be changed at the discretion of the Company.  The following terms and conditions will govern your service to the Company:
>
> 1. You will serve the Company on a full-time basis as a senior executive employee, and the Company will employ you as such, for a period of three years. . . .

The appellant relies on the same contractual language to argue that he was employed as the Vice President of Marketing for the company.  According to appellant, once Cleo removed his title and work responsibilities, it effectively ended his employment.

8

The interpretation of a contract is a matter of law that requires a *de novo* review on appeal. See Hamblen County v. City of Morristown, 656 S.W.2d 331, 335-336 (Tenn. 1983). When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language. Id. at 333-34; Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc., 521 S.W.2d 578, 580 (Tenn. 1975). All provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract. Rainey v. Stansell, 836 S.W.2d 117, 118-19 (Tenn. App. 1992), *perm. app. denied* (Tenn. 1992).

In this case, the contract refers to appellant's position of employment in two separate provisions. The opening provision states that he will "serve as Vice President of Marketing for Cleo, Inc.," reporting to the company president and conducting work functions that were currently assigned. The subsequent provision under Paragraph 1 describes his position as a full-time senior executive employee. We read those provisions together to mean that as Vice President of Marketing, the appellant was to be a full-time senior executive employee in the company.[4] Cleo promoted the appellant to that position with the condition that it could change his job functions and responsibilities during the course of the three-year contract. Those changes may have included altering his official job title. However, Cleo was contractually obligated to maintain appellant's employment as a full-time senior

---

[4]The Court of Appeals determined that the appellant was employed exclusively as the Vice President of Marketing based upon the opening provision of the employment contract. The court held that to the extent the subsequent provisions described the appellant as a senior executive employee, those latter provisions were unenforceable as being in conflict with the preceding "Vice President of Marketing" provision. We hold to the contrary that the provisions can be read congruently without having to redact any portion of the contract.

9

executive employee unless there was a cause for termination.[5] Cleo's contractual right to change the appellant's work duties did not include the right to remove all of his duties.

Cleo contends that it fulfilled its contractual obligation by keeping the appellant on the company payroll at his then current salary, even though it altered and effectively ended his work responsibilities. Cleo relies on the Court of Appeal's decision in Canady v. Meharry Med. College, 811 S.W.2d 902 (Tenn. App. 1991), *perm. app. denied* (Tenn. 1991). In Canady, the defendant/employer restricted the plaintiff's work duties and decided not to renew his employment contract as a hospital resident physician after the plaintiff received unsatisfactory job-performance ratings. Id. at 904. The court concluded, in part, that the restriction of plaintiff's work duties did not constitute a breach of the contract because the contract contained no express or implied assurance that the plaintiff would be given continuous, uninterrupted work assignments. Id. at 906.

The circumstances in Canady are clearly distinguishable from the appellant's case. Here, we are not dealing exclusively with a change or restriction of appellant's work responsibilities. The facts are undisputed that Cleo not only demoted the appellant from his position as Vice President of Marketing, but also ordered him to stay at his home and wait for any future assignments. During the three months that the appellant stayed at home, he received no work assignments and apparently did not perform any functions on behalf of the company. In addition, Cleo reclaimed appellant's company credit cards and informed him that the company would no longer

---

[5]As previously mentioned, "cause" was defined in the contract as "dishonesty, gross negligence, or willful misconduct in the performance of work duties or a willful or material breach of [the employment] Agreement." Cleo also had a right to terminate the contract under certain conditions of illness or incapacity as defined in Paragraph 6 of the contract.

answer telephone calls for him. All business contacts for Cleo and authority to act on behalf of the company were taken away from the appellant.

The undisputed facts in this case support the lower courts' holding that the appellant was constructively terminated from his employment. Moreover, Cleo has not shown cause to justify the termination. We, therefore, conclude that summary judgment for the appellant was appropriate on that issue.

## II.

We shall next address whether Paragraph 9 of the employment contract provides for severance pay or liquidated damages. The appellant contends that Paragraph 9 contemplates severance pay because its payment is not specifically conditioned upon a breach of contract. Cleo argues to the contrary that the sums under Paragraph 9 are liquidated damages because that paragraph calls for the payment of a set amount in the event of a certain occasion. Cleo contends, however, that no matter what label is given to the provision, it is unenforceable because the appellant suffered no actual monetary damages.

The Court of Appeals interpreted Paragraph 9 of the employment contract as a liquidated damages provision because it contemplates the "payment of a sum certain in the event of a certain occasion." We agree that Paragraph 9 provides for liquidated damages, not severance pay. However, our interpretation of Paragraph 9 is based upon the specific contract language that recovery is due in the event that Cleo "terminates this agreement and [appellant's] employment without cause," resulting in a breach of the contract.

The distinction between liquidated damages and severance pay is important in this case. If Paragraph 9 provides for liquidated damages, then recovery is conditioned upon a showing that Cleo breached the contract and that the amount of recovery was a reasonable estimation of damages. However, if the provision calls for severance pay, then recovery by the appellant is absolute in the event of his termination, regardless of whether Cleo breached the contract or whether the amount was a reasonable damage assessment.

The term "liquidated damages" is defined by case law as a "sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid to compensate for injuries should a breach occur." V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., Inc., 595 S.W.2d 474, 484 (Tenn. 1980); Kimbrough & Co. v. Schmitt, 939 S.W.2d 105, 108 (Tenn. App. 1996), perm. app. denied (Tenn. 1996). The stipulated amount represents an estimate of potential damages in the event of a contractual breach where damages are likely to be uncertain and not easily proven. V.L. Nicholson, 595 S.W.2d at 484.

In contrast, the recovery of severance pay is not conditioned upon a breach of contract or a reasonable estimation of damages. Generally, severance pay is a form of compensation paid by an employer to an employee at a time when the employment relationship is terminated through no fault of the employee. Black's Law Dictionary 1374 (6th ed. 1990). The reason for severance pay is to offset the employee's monetary losses attributable to the dismissal from employment[6] and to recompense the employee for any period of time when he or she is out of work. Bradwell v. GAF Corp., 954 F.2d 798, 800 (2nd Cir. 1992); 27 Am. Jur.2d Employment Relationship § 70 (1996). The amount of payment is generally based upon the types of services and

---

[6]Those losses may include seniority rights, pension recovery, and re-training costs or other burdens associated with obtaining new employment.

12

the number of service years performed by the employee on behalf of the employer. See Balding v. Tennessee Dep't of Employment Sec., 212 Tenn. 517, 370 S.W.2d 546, 548 (1963).

With these principles in mind, we focus on the language in Paragraph 9 to determine whether liquidated damages or severance pay was contemplated. Paragraph 9 provides that if Cleo terminates the contract and appellant's employment without cause, the appellant shall continue to receive his then current salary from the date of termination until October 31, 1995, the contract expiration date. Paragraph 9 does not state that sums payable are based upon an estimation of damages in the event of a breach of contract. However, it is clear that the provision affords the appellant a set amount of compensation in the event that Cleo terminates the agreement and appellant's employment, without cause, before the end of the contract.[7] Relying on the plain meaning of the language in Paragraph 9, we conclude that recovery therein is conditioned upon Cleo's breach of contract.

A contractual provision need not explicitly include the term "liquidated damages" to constitute a liquidated damages provision. In cases as here, where a provision entitles one party to a stipulated recovery following an event that constitutes a breach of contract, courts must look to the substance of the provision and the intentions of the parties to determine whether the provision calls for liquidated damages. If the parties agree in the contract on the amount of damages to be recovered for compensation, upon the occurrence of a particular defaulting event,

---

[7]The appellant argues, in part, that the dollar amount established in Paragraph 9 cannot be construed as liquidated damages because it is not sufficiently definite to constitute a "sum certain." We afford no merit to this contention. Under Tennessee law, a contractual provision does not have to specify a set dollar amount to constitute liquidated damages. See Vanderbilt Univ. v. Dinardo, 974 F. Supp. 638, 640 (M. D. Tenn. 1997) (applying Tennessee law), *rev'd in part*, __ F.3d __, 1999 WL 211871 (6th Cir. Apr. 14, 1999) (upholding the liquidated damages provision, but remanding for trial on a contract addendum); Harmon v. Eggers, 699 S.W.2d 159, 160 (Tenn. Ct. App. 1985), *perm. app. denied* (Tenn. 1985).

13

then the damages are liquidated unless the contract states otherwise.  See <u>V.L.</u>

<u>Nicholson</u>, 595 S.W.2d at 484.

The language in Paragraph 9 reflects the parties' intentions to compensate the appellant with a set monetary amount in the event that Cleo terminated the contract and the employment relationship without cause, before the end of the three-year term. Having further determined that the termination in this case was a breach of contract, we interpret Paragraph 9 as contemplating the payment of liquidated damages.

## III.

The remaining question is whether the appellant may recover any or all of the damages set forth in Paragraph 9.  Under that paragraph, the sum payable is the remainder of appellant's then current salary from the date of termination until the end of the contract term on October 31, 1995.  The appellant's salary as of December 1994, was $103,000.  Based upon that amount and the formula provided in Paragraph 9, the trial court determined that the remainder of salary owed under the three-year contract was $90,125.[8]

Cleo does not dispute the calculation of damages in this case, but instead contends that the $90,125 amount plus prejudgment interest is grossly disproportional to any actual damages suffered by the appellant.  Since the appellant obtained new employment on December 12, 1994, with an annual salary of $110,000, Cleo argues that appellant's recovery of liquidated damages under Paragraph 9 would constitute an unlawful penalty.

[8]The record does not reflect the exact date found by the trial court as the date when appellant was terminated from his employment.  However, based upon the $90,125 amount, it is apparent that the trial court treated December 15, 1994, as the approximate date of termination.  That date coincides with a letter sent by Cleo to the appellant on December 22, 1994, stating that the appellant had been paid his employment wages through December 15, 1994.

14

The basis of Cleo's contention is that if the appellant suffered no actual damages from the termination of his employment, then his recovery under Paragraph 9 would have no compensatory function, but would instead simply punish Cleo for the termination. Both parties acknowledge that Tennessee law disfavors the enforcement of a liquidated damages provision when the provision serves only to penalize the defaulting party for a breach of contract. See Testerman v. Home Beneficial Life Ins. Co., 524 S.W.2d 664, 668 (Tenn. App. 1974), *perm. app. denied* (Tenn. 1975).[9]

The fundamental purpose of liquidated damages is to provide a means of compensation in the event of a breach where damages would be indeterminable or otherwise difficult to prove. V.L. Nicholson, 595 S.W.2d at 484; 22 Am. Jur. 2d *Damages* § 683 (1988); Restatement (Second) of Contracts § 356 cmt. (1979). By stipulating in the contract to the damages that might reasonably arise from a breach, the parties essentially estimate the amount of potential damages likely to be sustained by the nonbreaching party. "If the [contract] provision is a reasonable estimate of the damages that would occur from a breach, then the provision is normally construed as an enforceable stipulation for liquidated damages." V.L. Nicholson, 595 S.W.2d at 484 (citing City of Bristol v. Bostwick, 146 Tenn. 205, 240 S.W. 774 (1921); 22 Am. Jur. *Damages* § 227 (1965)). However, if the stipulated amount is unreasonable in relation to those potential or estimated damages, then it will be treated as a penalty. 22 Am. Jur. 2d *Damages* § 686 (1988); Restatement (Second) of Contracts § 356 (1979).

Although most jurisdictions disfavor the enforcement of penalties under contract law, there is a split in authority on the proper method for determining whether

---

[9]As distinguished from liquidated damages, a penalty is "a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default, or by way of security for actual damages which may be sustained by reason of nonperformance, and it involves the idea of punishment." 22 Am. Jur. 2d *Damages* § 684 (1988).

a liquidated damages provision constitutes a penalty. One method, commonly referred to as the "prospective approach," focuses on the estimation of potential damages and the circumstances that existed at the time of contract formation.[10] Under this approach, the amount of actual damages at the time of breach is of little or no significance to the recovery of liquidated damages. 22 Am. Jur. 2d *Damages* § 723 (1988). If the liquidated sum is a reasonable prediction of potential damages and the damages are indeterminable or difficult to ascertain at the time of contract formation, then courts following the prospective approach will generally enforce the liquidated damages provision. See e.g. Gaines v. Jones, 486 F.2d 39, 46 (8th Cir. 1973) (applying Missouri law); Brazen v. Bell Atl. Corp., 695 A.2d 43, 48 (Del. 1997).

In contrast, a second approach has developed in which courts not only analyze the estimation of damages at the time of contract formation, but also address whether the stipulated sum reasonably relates to the amount of actual damages caused by the breach.[11] Under this retrospective approach, the estimation of potential damages and the difficulty in measuring damages remain integral factors for the courts' review. See e.g. Lake Ridge Academy v. Carney, 613 N.E.2d 183, 188-89 (Ohio 1993); Highgate

---

[10]See United States v. Bethlehem Steel Co., 205 U.S. 105, 119, 27 S.Ct. 450, 455, 51 L.Ed. 731 (1907); Gaines v. Jones, 486 F.2d 39, 44-45 (8th Cir. 1973); United States v. Le Roy Dyal Co., 186 F.2d 460, 462 (3rd Cir. 1950); Williwaw Lodge v. Locke, 601 P.2d 236, 239 (Alaska 1979); Omohndro v. Ottenheimer, 127 S.W.2d 642, 645 (Ark. 1939); McCarthy v. Tally, 297 P.2d 981, 986-87 (Cal. 1956) (in banc); Rohauer v. Little, 736 P.2d 403, 410 (Colo 1987); Hanson Dev. Co. v. East Great Plains Shopping Ctr., Inc., 485 A.2d 1296, 1300 (Conn. 1985); Brazen v. Bell Atl. Corp., 695 A.2d 43, 48 (Del. 1997); Lefemine v. Baron, 573 So.2d 326, 328 (Fla. 1991); Fickling & Walker Co. v. Gibbens Constr. Co., 376 S.E.2d 655, 659-60 (Ga. 1989); Anne Arundel County v. Norair Engr. Corp., 341 A.2d 287, 294 (Md. 1975); Frank v. Jansen, 226 N.W.2d 739 (Minn. 1975); Board of Trustees of State Inst. of Higher Learning v. Johnson, 507 So.2d 887, 890 (Miss. 1987); Knutton v. Cofield, 160 S.E.2d 29, 35-36 (N.C. 1968); Fisher v. Schmeling, 520 N.W.2d 820, 822 (N.D. 1994); Safari, Inc. v. Verdoorn, 446 N.W.2d 44, 46 (S.D. 1989); Woodhaven Apartments v. Washington, 942 P.2d 918, 921 (Utah 1997).

[11]See Thanksgiving Tower Partners v. Anros Thanksgiving Partners, 64 F.3d 227, 232 (5th Cir. 1995) (applying Texas law); Southpace Properties, Inc. v. Acquisition Group, 5 F.3d 500, 505 (11th Cir. 1993) (applying Alabama law); Kelly v. Marx, 694 N.E.2d 869, 871-72 (Mass. App. Ct. 1998); Hawkins v. Foster, 897 S.W.2d 80, 85 (Mo. Ct. App. 1995); Browning Ferris Indus. of Nebraska, Inc. v. Eating Establishment 90th & Fort, Inc., 575 N.W.2d 885, 888-89 (Neb. Ct. App. 1998); Shallow Brook Assoc. v. Dube, 599 A.2d 132, 137 (N.H. 1991); Boyle v. Petrie Stores Corp., 518 N.Y.S.2d 854, 861 (N.Y. Sup. Ct. 1985), *supp. decision* (May 29, 1987); Lake Ridge Academy v. Carney, 613 N.E.2d 183, 189 (Ohio 1993); Highgate Assoc., LTD. v. Merryfield, 597 A.2d 1280, 1282 (Vt. 1991) (reviewing the totality of the circumstances); Wheeling Clinic v. Van Pelt, 453 S.E.2d 603, 609 (W. Va. 1994); Wassenaar v. Panos, 331 N.W.2d 357, 361-62 (Wis. 1983) (reviewing the totality of the circumstances, including actual damages).

Assoc., LTD. v. Merryfield, 597 A.2d 1280, 1282 (Vt. 1991). However, as part of that review, the actual damages at the time of breach are also relevant in determining whether the original estimation of damages was reasonable. See Kelly v. Marx, 694 N.E.2d 869, 871 (Mass. Ct. App. 1998); Wassenaar v. Panos, 331 N.W.2d 357, 361-62 (Wis. 1983). If the liquidated sum greatly exceeds the amount of actual damages, then courts following this latter approach will treat the estimated sum as a penalty and will limit recovery to the actual damages. Kelly, 694 N.E.2d at 871; Shallow Brook Assoc. v. Dube, 599 A.2d 132, 137 (N.H. 1991).

While this Court has not previously addressed the issue, we note that the Court of Appeals has followed the latter approach using both a prospective review of the circumstances at the time of contract formation and a review of the actual damages at the time of breach. See Kimbrough & Co., 939 S.W.2d at 108; Beasley v. Horrell, 864 S.W.2d 45, 50 (Tenn. App. 1993), *perm. app. denied* (Tenn. 1993); Kendrick v. Alexander, 844 S.W.2d 187, 190-91 (Tenn. App. 1992), *perm. app. denied* (Tenn. S1992) (following a prospective approach for assessing the reasonableness of a liquidated damages provision); Harmon, 699 S.W.2d at 163; Eller Bros., Inc. v. Home Fed. Sav. & Loan Assoc., 623 S.W.2d 624, 628 (Tenn. App. 1981), *perm. app. denied* (Tenn. 1981). After careful consideration, we find that there are inherent problems with the retrospective analysis and are persuaded that a prospective approach is the better rule. Therefore, to the extent that the Court of Appeals has adopted a retrospective approach, as reflected in Eller Bros., Harmon, Beasley, and Kimbrough & Co., that approach is overruled.

From our review of the law on liquidated damages, we recognize that there are two important interests at issue: the freedom of parties to bargain for and to agree upon terms such as liquidated damages and the limitations set by public policy. Generally, the parties to a contract are free to agree upon liquidated damages and

upon other terms that may not seem desirable or pleasant to outside observers. <u>See</u> <u>Chapman Drug Co. v. Chapman</u>, 207 Tenn. 502, 341 S.W.2d 392, 398 (1960); 22 Am. Jur. 2d *Damages* § 686 (1988). In that respect, courts should not interfere in the contract, but should carry out the intentions of the parties and the terms bargained for in the contract, unless those terms violate public policy. <u>See</u> <u>McKay v. Louisville &</u> <u>N.R. Co.</u>, 133 Tenn. 590, 182 S.W. 874, 875 (1916) (citing <u>Baltimore & Ohio S.W. Ry.</u> <u>Co. v. Voight</u>, 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900)).

Both the prospective and the retrospective approaches allow courts to review liquidated damages provisions together with the limitations set by public policy. However, we conclude that the prospective approach is the better rule based upon the consideration it affords to the intentions of the parties and to the freedom to contract.

When parties agree to a liquidated damages provision, it is generally presumed that they considered the certainty of liquidated damages to be preferable to the risk of proving actual damages in the event of a breach. 22 Am. Jur. 2d *Damages* § 726. Liquidated damages permit the parties to allocate business and litigation risks and often serve as part of the contractual bargain. In addition, they lend certainty to the contractual agreement and allow the parties to resolve defaults and other related disputes efficiently, when actual damages are impossible or difficult to measure. C.T. McCormick, *Handbook on the Law of Damages* § 157 (1935).

The retrospective approach, however, undermines the certainty and other benefits afforded by liquidated damages. Under that approach, the parties are allowed to fully litigate actual damages following a breach of contract. If the nonbreaching party fails to prove actual damages, then he or she is barred from recovering the liquidated sum originally agreed upon in the contract. We find that it is

unfair to require the nonbreaching party to prove actual damages in cases where the parties agreed in advance to a liquidated damages provision. Such a requirement ignores the original intentions of the parties and defeats the purposes of stipulating in advance to potential damages.

We, therefore, adopt a prospective approach for addressing the recovery of liquidated damages. Under this approach, courts must focus on the intentions of the parties based upon the language in the contract and the circumstances that existed at the time of contract formation.[12] Those circumstances include: whether the liquidated sum was a reasonable estimate of potential damages and whether actual damages were indeterminable or difficult to measure at the time the parties entered into the contract. See V.L. Nicholson, 595 S.W.2d at 484. If the provision satisfies those factors and reflects the parties' intentions to compensate in the event of a breach, then the provision will be upheld as a reasonable agreement for liquidated damages. However, if the provision and circumstances indicate that the parties intended merely to penalize for a breach of contract, then the provision is unenforceable as against public policy.

## IV.

We now turn to the liquidated damages provision in this case. The Court of Appeals found that the liquidated sum was a reasonable estimation of potential damages at the time the parties entered into the contract. We agree. Neither the appellant nor Cleo had certain knowledge, when forming the contract, that the

---

[12]This prospective approach incorporates the cardinal rule of contract interpretation, requiring courts to ascertain the intentions of the parties based upon the language in the contract. See Bob Pearsall Motors, Inc., 521 S.W.2d at 580; Nunnelly v. Warner Iron Co., 94 Tenn. 282, 29 S.W. 124 (1895).

appellant would be able to secure other employment in the event that Cleo terminated his employment without cause. It was within the fair contemplation of the parties that the appellant might not be able to find a similar professional position at the same salary and that he might suffer damages that would be difficult to prove, including loss of professional status, prestige, and advancement opportunities. The language in Paragraph 9 reflects the parties' intentions to compensate and to protect the appellant against those potential losses in the event of a breach by Cleo.

The Court of Appeals, however, went further in addressing whether the stipulated sum reasonably related to the appellant's actual damages. Cleo insists that the intermediate court's analysis was both proper and fair based upon the fact that the appellant obtained new employment at a higher salary after the termination. While we question whether the record is sufficient on the issue of actual damages,[13] we conclude that the extent of actual damages has no bearing on the appellant's recovery of liquidated damages under Paragraph 9. The liquidated sum is recoverable based upon our conclusion that it was reasonable at the time the parties entered into the contract and that it reflects the parties' original intentions to compensate for a termination of employment.

The parties themselves were in the best position to know what considerations influenced their bargaining at the time they entered into the contract. While "'[t]he bargain may be an unfortunate one for the delinquent party, ... it is not the duty of courts of common law to relieve parties from the consequences of their own improvidence.'" Watson v. Ingram, 881 P.2d 247, 250 (Wash. 1994) (quoting Dwinel v. Brown, 54 Me. 468, 470 (1867)). See also McKay, 182 S.W. at 875; Whaley v.

---

[13]The trial court awarded summary judgment to the appellant without making a finding on actual damages or whether the recovery constituted severance pay or liquidated damages. Nevertheless, because we hold that actual damages are immaterial in this case, we need not address the sufficiency of the record in that respect.

20

<u>Underwood</u>, 922 S.W.2d 110, 112 (Tenn. App. 1995). Accordingly, to the extent the Court of Appeals based its decision upon a review of actual damages, that decision is overruled.

**CONCLUSION**

Based upon the foregoing, we conclude that summary judgment for the appellant was appropriate on the issue of constructive termination. Moreover, because Paragraph 9 was a reasonable estimation of damages at the time the parties entered into the contract, we conclude that the appellant is entitled to recover the full amount stipulated in that provision. The judgment of the Court of Appeals is reversed and the trial court's award of summary judgment for the appellant is reinstated. Costs of this appeal are taxed to the appellee, Cleo.

_____
WILLIAM M. BARKER, JUSTICE

CONCUR:

Anderson, C.J.,
Drowota, Birch, Holder, JJ.


SUPREME COURT, JACKSON


| ANTHONY P. GUILIANO | ) | |
| | ) | |
| Plaintiff/Appellant | ) | SHELBY CIRCUIT |
| | ) | 67428 T.D. Below |
| v. | ) | |
| | ) | 02S01-9801-CV-00002 |
| CLEO, INC. | ) | |
| | ) | Court of Appeals Reversed, |
| Defendant/Appellee | ) | Trial Court Affirmed |
| | ) | |

)

<u>JUDGMENT</u>

This case was heard on the record on appeal from the Court of Appeals, application for permission to appeal having heretofore been granted, with briefs and argument of counsel; and in consideration thereof, this Court is of the opinion that the appellant, Anthony P. Guiliano, was terminated from his employment and that the liquidated damages provision is fully enforceable against the appellee, Cleo, Inc.

In accordance with the opinion filed herein, it is, therefore, ordered and adjudged that the judgment of the Court of Appeals is reversed and the trial court's order granting summary judgment in favor of the appellant is affirmed. The case is remanded to the Circuit Court of Shelby County for the execution of the judgment and for the collection of costs accrued below.

Costs of this appeal will be paid by the appellee for which execution shall issue if necessary.

06/28/99

22