# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 28, 2016 Session

## SPIRIT BROADBAND, LLC, ET AL. v. JOSEPH ANTHONY ARMES, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 121023II  Carol L. McCoy, Chancellor**
_____

**No. M2015-00559-COA-R3-CV – Filed January 27, 2017**
_____

This case arises from the sale of the assets of a small cable television system. DirecTV program channels constituted the majority of the system's programming. Three years after the sale, DirecTV stopped providing its programming signal to the cable system, claiming the signal had been obtained illegally. The buyer of the cable system filed suit against DirecTV for breach of contract and defamation. After reaching a settlement with DirecTV, the buyer filed this action against the seller of the cable system, seeking damages for breach of contract and fraud and a declaratory judgment that the promissory note the buyer had executed as part of the purchase was not yet due and payable. The seller filed a counterclaim, seeking payment of the promissory note. After a bench trial, the trial court dismissed the buyer's claims against the seller. The court also dismissed the seller's counterclaim under the doctrine of unclean hands. After a review of the record, we conclude that the chancery court did not abuse its discretion in determining that the doctrine of unclean hands barred the seller's counterclaim. Accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

William T. Alt, Chattanooga, Tennessee, for the appellants, Joseph Anthony Armes and Cumberland County Cable, Inc.

Robert J. Mendes and R. Mark Donnell, Jr., Nashville, Tennessee, for the appellee, Spirit Broadband, LLC.

John R. Wingo and Nicholas R. Barry, Nashville, Tennessee, for the appellee, U.S. Bank, N.A.

# OPINION

## I. Factual and Procedural Background

### A. Purchase of the Cumberland County Cable System

The principal players in this dispute, Joseph Armes and Vincent King, have been involved in the cable television industry for over thirty years. Both are experienced businessmen, familiar with the process of buying or selling a cable system.[1]

Mr. Armes owned Cumberland County Cable TV, Inc. ("CCC"), a cable system that served mostly rural subscribers in Cumberland County, Tennessee. The system was small, consisting of one "headend"[2] and approximately one hundred miles of transmission cables or "plant." The system offered its subscribers approximately 60 basic channels and 70 digital channels, the majority of which were DirecTV, Inc. channels.

On July 29, 2006, Mr. King offered to purchase the assets of CCC for five million dollars. Mr. King made the offer subject to a number of conditions, including a reasonable due diligence investigation. The offer resulted in an asset purchase agreement, executed on January 28, 2007. In the agreement, CCC made a series of representations and warranties about the cable system and its assets. The sale was conditioned upon, among other things, the purchaser "be[ing] fully satisfied, in its sole and absolute discretion, with its due diligence investigation" of CCC and its assets.

After several months of due diligence, the sale closed on June 6, 2007. CCC sold to Spirit Broadband, LLC ("Spirit"), a company formed by Mr. King, all of CCC's "right, title and interest, legal or equitable, in and to the assets." The assets included, among other items, "[a]ny and all rights of [CCC] under the . . . programming agreements, contracts, agreements and permits necessary to operate the Systems (the "Operating Contracts")." The bill of sale delivered by CCC and Mr. Armes expressly incorporated the terms of the asset purchase agreement and provided that the representations and warranties contained in the asset purchase agreement would survive the closing.

At closing, Spirit paid a net purchase price of $4.8 million.[3] Spirit delivered a promissory note made payable to CCC in the principle amount of $1.5 million, secured

---

[1] Mr. Armes had previously sold Mr. King the assets of another cable system.

[2] A headend is a distribution point at which cable providers collect and assemble program signals. *DIRECTV, Inc. v. Roberts*, 477 S.W.3d 293, 296 (Tenn. Ct. App. 2015), *cert. denied*, 136 S. Ct. 401 (2015).

[3] The asset purchase agreement called for a $2,000 deduction in the purchase price for each

2

by the system's assets and equipment. Spirit paid the balance, after holdbacks and prorations, to CCC in cash.

Spirit financed the cash consideration through a loan from U.S. Bank. Contemporaneously with the sale, Spirit signed a promissory note payable to U.S. Bank in the amount of $2.5 million, which was also secured by a security interest in the system's equipment. As a condition of the loan, U.S. Bank required Spirit and CCC to execute a subordination agreement, subordinating CCC's right to payment under its promissory note and security interest to the rights of U.S. Bank. Specifically, among other things, the subordination agreement provided that no payments were due to CCC "until the U.S. Bank Note has been paid in full or until one (1) year past the maturity date of the U.S. Bank Note, whichever first occurs."

After the closing, Spirit continued to transmit DirecTV programming to subscribers in the same manner as CCC had done before the sale. Over time, however, Spirit replaced a number of the DirecTV channels CCC had provided with programming from other vendors.

## B. PREVIOUS LITIGATION

Spirit initially filed suit against CCC and Mr. Armes in 2010, alleging breach of contract, fraudulent misrepresentation, fraudulent inducement, unfair and deceptive trade practices, and unjust enrichment. After Spirit and CCC agreed to settle the 2010 action but before a written settlement agreement was executed, DirecTV shut off its signal to Spirit's subscribers and told the subscribers who complained that they were receiving the channels illegally. In light of these developments, in the written settlement agreement, Spirit expressly reserved any claims related to its issues with DirecTV.

After its settlement with CCC and Mr. Armes, Spirit filed suit against DirecTV and others seeking damages for defamation, tortious interference, and violation of the Tennessee Consumer Protection Act, among other claims. DirecTV filed a counterclaim, alleging that Spirit was broadcasting its signal illegally. After discovery revealed that the system's use of DirecTV program channels was illegal, Spirit paid DirecTV $250,000 in settlement of all claims and agreed to the entry of a permanent injunction prohibiting Spirit from retransmitting DirecTV program channels or operating DirecTV satellite receiving equipment without authorization from DirecTV.

Spirit borrowed the funds for the settlement from U.S. Bank. During this time period, Spirit also refinanced its earlier loan from U.S. Bank. The new borrowing for the DirecTV settlement and the refinancing of the earlier loan that funded the purchase of CCC's assets were reflected in a single, amended promissory note in favor of U.S. Bank.

equivalent basic subscriber under 2,500 as of the closing date.

## C. THE CURRENT ACTION

On July 13, 2012, Spirit filed this action in the Chancery Court for Davidson County, Tennessee, against Mr. Armes and CCC. The suit sought a declaratory judgment that the promissory note held by CCC was not yet due and payable and requested damages for breach of contract, fraudulent misrepresentation, fraudulent inducement, unfair and deceptive trade practices, and unjust enrichment. Spirit alleged that CCC breached the asset purchase agreement because one asset, the DirecTV programming agreement, was not as represented.

With regard to fraudulent misrepresentation and fraudulent inducement, Spirit alleged that Mr. Armes and CCC made misrepresentations knowing Spirit would rely on those misrepresentations in deciding whether to purchase the assets. Spirit claimed these same misrepresentations violated the Tennessee Consumer Protection Act and entitled Spirit to treble damages. *See* Tenn. Code Ann. §§ 47-18-101 to -130 (2013).

Mr. Armes and CCC denied Spirit's allegations, and CCC filed a counterclaim seeking payment under the amended promissory note.[4] According to CCC, when Spirit refinanced the U.S. Bank note, the note was paid in full, thereby fulfilling the terms of the subordination agreement. In its answer to the counterclaim, Spirit asserted the subordination agreement remained in effect and raised several equitable defenses, including the doctrine of unclean hands. In light of the counterclaim, Mr. Armes and CCC moved to add U.S. Bank as a party to the suit, which the chancery court granted.

## D. PROOF AT TRIAL

The chancery court heard testimony from several witnesses over a four-day span. Mr. King and his chief financial officer, Patricia Hasbrouck, testified on behalf of Spirit. Mr. Armes and three former CCC employees also testified. The court heard from competing experts on the cable television industry and an expert witness on the Federal Communications Commission. Additional witnesses testified about the loans from U.S. Bank and the amount due under the promissory note. The court also reviewed the deposition testimony of two witnesses with knowledge of the contract with DirecTV.

Mr. King testified that he noticed DirecTV equipment on his initial inspection of the headend. When he questioned Mr. Armes, he learned that the system had an agreement allowing the transmission of DirecTV programming to its subscribers. Jason Tanner, the head technician, also told Mr. King's engineer that the system owned the DirecTV equipment and had a distribution agreement with DirecTV. The system's use of

---

[4] As part of the settlement of the previous litigation, Spirit signed an amended promissory note in favor of CCC with a reduced principal amount of $900,000.

DirecTV programming did not rouse Mr. King's suspicions because he was familiar with other situations in which DirecTV allowed its signal to be rebroadcast on a cable system.

According to Mr. King, Josh Pemberton, Mr. Armes's son-in-law and the system's general manager, confirmed the information. Mr. Pemberton explained that the system was billed monthly for DirecTV programming by another company, Direct Video Networks, which Mr. King assumed to be an aggregator.[5]

Ms. Hasbrouck learned similar information. In reviewing the system's finances, she discovered a drop in programming costs starting in 2005. When she questioned Ron Raulston, the system's accountant, about this, he explained that the system had obtained a programming agreement with a low introductory rate through an aggregator.

Both Mr. King and Ms. Hasbrouck expressed interest in reviewing the DirecTV contract. Despite repeated requests, however, they did not receive a copy before the closing. In their experience, small cable systems were often disorganized, and the Cumberland County system was no exception. Ms. Hasbrouck described CCC's filing system as incomplete and scattered. Moreover, shortly after the asset purchase agreement was executed, Mr. Pemberton left for another job, and Mr. Raulston died unexpectedly, further complicating any document review.

Mr. King explained that he made the decision to close without reviewing the DirecTV contract because he was comfortable with the information he had learned. He had seen the DirecTV equipment and confirmed that the system had been routinely paying for DirecTV programming since 2005. He also relied on the assurances he received from Mr. Armes and others[6] that the DirecTV contract was "good" and that a copy of the contract would soon be found. According to Mr. King, he had dealt with missing documentation in previous deals without any significant problems.

Ms. Hasbrouck agreed with the decision to close. She testified that she was satisfied at closing that the Cumberland County system had been paying for DirecTV programming for a number of years without any problems. In her experience, programmers never shut off service as long as the bill was being paid.

---

[5] According to the testimony, aggregators contract with various programmers and sometimes offer programming at a discounted rate. Because negotiating programming agreements with different vendors can be time-consuming, small cable companies often obtain programming through an aggregator.

[6] Mr. Armes denied Mr. King ever discussed the DirecTV contract with him while Josh Pemberton claimed no memory of any conversations with Mr. King. Jason Tanner, however, admitted that he told Mr. King's engineer that the system owned the DirecTV equipment and had a distribution agreement with DirecTV.

According to him, Mr. King's first viewing of the DirecTV contract occurred shortly after closing when he found a one-page document in the engineering files. The document contained the signatures of Mr. Pemberton and Mr. Tanner and was entitled "Lodging and Institutions New Customer Information Form." Mr. King believed the document was part of the DirecTV contract. Mr. King claimed that he promptly called Steve Friedman, president of Direct Video Networks, and inquired whether the document allowed the system to transmit the DirecTV programming. According to Mr. King, Mr. Friedman confirmed the system had the ability to transmit the DirecTV signal to its subscribers. Mr. Friedman, however, denied that Mr. King had ever asked him whether Spirit could transmit DirecTV signals to individual subscribers.

The first time Mr. King reviewed the entire DirecTV contract was during the DirecTV litigation. The contract, entitled "Lodging and Institutions SMATV Viewing Agreement," provided that it was "applicable only to Multiple Dwelling Units." The contract defined a "Multiple Dwelling Unit" as "an individual dwelling unit located in a hotel, motel, hospital, college dormitory, private office, apartment/condominium building and/or other facility . . . that is not generally accessible to the public nor otherwise a common area."

Mr. Pemberton, CCC's general manager, signed the contract, but he did so as general manager of "Pleasant Hills." The Lodging and Institutions New Customer Information Form, which formed part of the DirecTV contract, indicated that Pleasant Hills was a health care institution, examples of which included hospitals, nursing homes, assisted living facilities, long term care facilities, medical clinics, and dialysis clinics. Mr. Pemberton also certified that there were 1075 subscriber units,[7] which, for health care facilities, was described as the "[t]otal number of televisions on premises in patient rooms."

A cable television consultant testified that multiple dwelling unit or bulk subscribers, like health care facilities, receive discounted rates. In this case, CCC enjoyed a 50% discount on marketplace rates for the program channels covered by the DirecTV contract. He also noted that satellite television providers, such as DirecTV, are fierce competitors with cable television providers and that DirecTV would never transmit its channels to a cable television provider for retransmission to individual subscribers.

CCC's head technician, Mr. Tanner, described how CCC came to provide DirecTV channels to its subscribers. He testified that, while searching for replacement equipment during a system upgrade, he found a company that supplied DirecTV equipment at a discounted cost. The only caveat was that the company required the system to purchase the equipment and the programming together. He then brought this

---

[7] Mr. Pemberton executed two Lodging and Institutions SMATV Viewing Agreements on the same date, one for 107 subscribers and one for 1075 subscribers.

information to the attention of the office manager and Mr. Pemberton. According to Mr. Tanner, Mr. Pemberton handled the negotiations and signed the paperwork.

For his part, Mr. Pemberton claimed that that he had no memory of his interactions with Direct Video Networks or the DirecTV contract. Despite his title, he described himself as a glorified errand boy. He claimed that he had no real authority, although he acknowledged he could sign checks and contracts.

The president of Direct Video Networks, Mr. Friedman, explained his company's business. Rather than acting as an aggregator, Direct Video Networks sold DirecTV programming to commercial bulk subscribers, such as health care facilities, in exchange for a commission from DirecTV. According to him, he received a referral of the Cumberland County system as a potential new customer. Mr. Friedman was under the impression that the system was either a nursing home named Pleasant Hills or a video service provider that serviced a nursing home.

Direct Video Networks sent the activation paperwork to Mr. Pemberton, who completed and returned it in December of 2004. Direct Video Networks then forwarded the completed paperwork to DirecTV. Normally the company's involvement ended once the bulk customer paperwork was received by DirecTV. For reasons that were not explained, in this case, Direct Video Networks continued to send monthly invoices to the Cumberland County system and forward the system's payments to DirecTV.

E. CHANCERY COURT RULING

The chancery court issued its final judgment on February 25, 2015. The court found that the asset sale included all programming agreements and that Mr. Armes and CCC employees had made multiple misrepresentations concerning the DirecTV programming. In spite of these findings, the court dismissed all of Spirit's claims against Mr. Armes and CCC with prejudice.[8] The court found that CCC had breached the asset purchase agreement but reasoned that Spirit's failure to conduct a reasonable due diligence investigation barred its recovery for breach of contract.

The court further determined that Spirit failed to file its claims for fraudulent misrepresentation, fraudulent inducement, and violation of the Tennessee Consumer Protection Act within the applicable statutes of limitations. Alternatively, the court concluded that Spirit's fraud claims were barred by its failure to perform proper due diligence.

The court dismissed with prejudice the defendants' counterclaim for payment of the amended note based on their fraudulent conduct in obtaining the note. The court also

---

[8] The dismissal of Spirit's claims is not before us on appeal.

7

found that the amended note specified simple, not compound interest, and that U.S. Bank's position as a secured party was not altered by the refinancing of the original note.

## II. ANALYSIS

In non-jury cases, the trial court's findings of fact are presumed to be correct unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d); *In re Estate of Boote*, 265 S.W.3d 402, 418 (Tenn. Ct. App. 2007) ("The evidentiary standard when assessing the evidentiary foundation of an argument that the unclean hands doctrine should be applied is the preponderance of the evidence standard."). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We review a trial court's conclusions of law de novo, with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

### A. UNCLEAN HANDS DOCTRINE

Although CCC and Mr. Armes have identified six issues for review, the dispositive issue is whether the chancery court abused its discretion in refusing to enforce Spirit's promissory note based on the doctrine of unclean hands. The application of the doctrine of unclean hands is within the chancery court's discretion, and we review the court's decision under the abuse of discretion standard. *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009). A court abuses its discretion when it applies an incorrect legal standard, reaches an unreasonable result, or bases its decision on a clearly erroneous assessment of the evidence. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). In reviewing the trial court's exercise of discretion, we presume that the decision is correct and review the evidence in a light most favorable to upholding the decision. *Lovlace v. Copley*, 418 S.W.3d 1, 16-17 (Tenn. 2013).

The doctrine of unclean hands is an appropriate defense to an action to collect on a promissory note. *Cont'l Bankers Life Ins. Co. v. Simmons*, 561 S.W.2d 460, 464 (Tenn. Ct. App. 1977). The success of the defense is not contingent upon the successful pursuit of an actionable fraud claim. *Prism Partners, L.P. v. Figlio*, No. 01A01-9703-CV-00103, 1997 WL 691528, at *7 (Tenn. Ct. App. Nov. 7, 1997). Therefore, the chancery court's dismissal of Spirit's fraud claims does not bar consideration of the unclean hands defense.

Our Supreme Court has described the doctrine of unclean hands as a maxim of equity that bars equitable relief in certain instances. Specifically,

> [t]he principle is general, and is one of the maxims of the Court, that he who comes into a Court of Equity asking its

8

> interposition in his behalf, must come with clean hands; and if it appear[s] from the case made by him, or by his adversary, that he has himself been guilty of unconscientious, inequitable, or immoral conduct, in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of, or depends upon, or is inseparably connected with his own prior fraud, he will be repelled at the threshold of the court.

*C.F. Simmons Med. Co. v. Mansfield Drug Co.*, 23 S.W. 165, 168 (Tenn. 1893); *see also Coleman Mgmt., Inc.*, 304 S.W.3d at 351-52 (describing application of the unclean hands doctrine). The focus of our inquiry is on whether the alleged misconduct was directly related to the transaction which formed the basis for CCC's counterclaim. *Chappell v. Dawson*, 308 S.W.2d 420, 422 (Tenn. 1957).

1. The Scope of the Asset Sale

CCC and Mr. Armes argue that their misconduct was not directly related to the execution of the promissory note because the asset sale did not involve programming agreements. Contract interpretation is a question of law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). On appeal, the trial court's interpretation of a contract is not entitled to a presumption of correctness. *Angus v. W. Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). We review the relevant documents de novo and "reach our own independent conclusions regarding their meaning and legal import." *Guiliano*, 995 S.W.2d at 95; *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

In interpreting a contract, our role is "to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009). We first look for the parties' intent as expressed in the natural and ordinary meaning of the words used in the contract. *Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). If the language used is clear and unambiguous, we need go no further. *Id.* However, if the terms are ambiguous, we will refer to established rules of construction in determining the parties' intent. *Id.* Contract language is ambiguous if its meaning is uncertain, and it is "susceptible to more than one reasonable interpretation." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). A contract is not ambiguous merely because the parties "differ as to interpretations of certain of its provisions." *Id.*

We must examine both the bill of sale and the asset purchase agreement to determine whether the parties intended for the sale to include programming agreements. The bill of sale incorporated the terms of the asset purchase agreement and specified both documents would survive the closing and remain binding on the parties. When a contract expressly incorporates another document as part of the same transaction, we construe

9

both contracts together. *Hardeman Cty. Bank v. Stallings*, 917 S.W.2d 695, 698 (Tenn. Ct. App. 1995); *Engert v. Peerless Ins. Co.*, 382 S.W.2d 541, 547 (Tenn. Ct. App. 1964).

In the bill of sale, CCC and Mr. Armes agreed to sell all of their right, title and interest in "any and all assets owned by Sellers and utilized in the operation of the cable television system[] . . . including, but not limited to . . . :

> (g) Any and all rights of Sellers under the non-governmental leases, right-of-way agreements, pole attachment contracts, easements, [access] agreements, personal property leases and other programming agreements, contracts, agreements and permits necessary to operate the Systems (the "Operating Contracts"), including, but not limited to, those certain Operating Contracts listed on Schedule III attached hereto[.]

Schedule III contained only one word: "none."

The language used in the asset purchase agreement is similar. CCC agreed to sell the franchises, operating contracts, and other property used in the operation of the system, including: "any and all rights of Seller under the Operating Contracts, including, but not limited to, those certain operating agreements listed on Schedule 1.1(g) attached hereto and incorporated herein by reference[.]" The asset purchase agreement defined "Operating Contracts" to include "programming agreements, contracts, agreements and permits necessary to operate the Systems[.]" Again, the referenced Schedule 1.1(g) contained the word "none."

We conclude that the sale included programming agreements. The bill of sale conveyed "any and all assets" used in the operation of the system, including "any and all rights" of the seller under the "programming agreements . . . necessary to operate the System." Programming agreements are clearly listed in the definition of "operating contracts," which in turn are included in the definition of "assets."

CCC and Mr. Armes point to the schedules as evidence that the parties did not intend to transfer any operating contracts. We cannot agree that the schedules limited the broad definition of operating contracts. To the contrary, the introductory phrase, "including, but not limited to," used in reference to operating contracts served a descriptive, not a restrictive, function. *See Sears, Roebuck & Co. v. Roberts*, No. M2014-02567-COA-R3-CV, 2016 WL 2866141, at *6 (Tenn. Ct. App. May 11, 2016), *appeal denied*, (Sept. 23, 2016) (agreeing that "including" does not normally introduce an exhaustive list). The only provision in the sale documents limiting the scope of the conveyed assets is Section 1.2 of the asset purchase agreement. In that section, the

parties listed all assets excluded from the sale, without mention of programming agreements.[9]

Finally, CCC and Mr. Armes claim that other contract provisions evidence the parties' intent to exclude programming agreements from the sale. As one example, CCC and Mr. Armes point out that the asset purchase agreement includes a representation by CCC that no consents or approvals were necessary for the consummation or effectiveness of the sale. However, such a representation is not necessarily inconsistent with the proposition that the assets to be transferred included contracts. Though it may be exceedingly rare for a modern contract not to include a provision either prohibiting or restricting assignment, "[g]enerally, contractual rights can be assigned." *Petry v. Cosmopolitan Spa Int'l, Inc.*, 641 S.W.2d 202, 203 (Tenn. Ct. App. 1982). The representation in the asset purchase agreement could reflect the fact that all operating agreements to be assigned are freely assignable. Alternatively, the representation could have been false as some of CCC's other representations appear to have been.

We do agree with CCC and Mr. Armes that both the asset purchase agreement and bill of sale contain language regarding assumed liabilities[10] that is inconsistent with the idea that programming agreements would be assigned. As one commentator noted, "[i]It is rare in an asset purchase for the buyer not to assume some of the seller's liabilities relating to the business, as for example the seller's obligations under contracts for the performance of services . . . ." Byron F. Egan, *Asset Acquisitions: Assuming & Avoiding Liabilities*, 116 Penn St. L. Rev. 913 (2012).

We attempt to construe all provisions in a contract in harmony with each other, "if possible, to promote consistency and to avoid repugnancy." *Guiliano*, 995 S.W.2d at 95. But "[i]f repugnant clauses cannot be harmonized so as to give effect to both, and one is subordinate to the principal purpose and intent of the contract, a court will disregard it rather than permit it to destroy and nullify the contract. *Smithart v. John Hancock Mut. Life Ins. Co.*, 71 S.W.2d 1059, 1064 (Tenn. 1934). In this instance and under these circumstances, we conclude that it is appropriate to disregard the assumption of liabilities language as it relates to programming agreements. The principle purpose of the asset

---

[9] The only excluded assets were cash, recent accounts receivable, motor vehicles, proprietary billing and accounting software, insurance policies, and assets not used directly in the operation of the system.

[10] CCC and Mr. Armes argue that the Post-Closing Holdback Agreement also bolsters their argument. As neither the bill of sale nor the asset purchase agreement references the post-closing document, we are not compelled to construe these documents together. Even so, we are not persuaded that the fact that CCC received a credit at closing for paying the invoice for DirecTV programming for June supports the position of CCC and Mr. Armes.

11

purchase agreement was clearly to convey the assets of CCC so that Spirit could continue to serve CCC's subscribers in the same manner as before the sale.

We conclude that programming agreements, including the DirecTV contract, were assigned as part of the sale. Therefore, a nexus exists between CCC's wrongful acts and the promissory note made by Spirit in favor of CCC for the purchase of its assets.[11] Any misrepresentations concerning CCC's right to use DirecTV program channels were directly related to the sale of the cable system.

## 2. Credibility Determinations

Because the determination of whether to apply the doctrine of unclean hands is heavily fact-dependent, "credibility determinations can be pivotal." *In re Estate of Boote*, 265 S.W.3d at 418. As this court has previously explained, "the trial court is in the best position to make these determinations because it has the opportunity to view the witnesses as they are testifying." *Id.* We accord great weight to the chancery court's credibility determinations. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000).

After hearing all of the witness testimony, the chancery court found that the testimony offered by Mr. Armes, Mr. Pemberton, and CCC's office manager was simply not credible. The court found that CCC employees made numerous misrepresentations designed to induce Mr. King to enter into the asset purchase agreement and that "the egregious omissions and specific misrepresentations by Mr. Armes" misled Mr. King as to the system's right to use DirecTV programming and equipment. Based on these findings, the court determined that "Mr. Armes and CCC committed fraud upon Spirit," as part of the same transaction in which Spirit executed the promissory note.

CCC argues, however, that Spirit was not deceived by any of the alleged misrepresentations, and, in fact, was an equal participant in the fraud. The chancery court did find that Mr. King, as an experienced businessman, should have discovered the truth about the DirecTV program channels, but such a finding is not inconsistent with a finding that Mr. King was misled or that fraud was committed upon Spirit. The evidence does not preponderate against the court's factual findings.

---

[11] CCC and Mr. Armes further argue that because Mr. King signed the asset purchase agreement on behalf of TV Broadband of Cumberland County, LLC, any fraud that occurred in connection with that agreement was not against Spirit. We disagree. Mr. King testified at the hearing that when he executed the asset purchase agreement, he intended to use the name, TV Broadband, for the company that would acquire the cable system. Subsequently, he decided to name the acquiring entity Spirit Broadband, LLC. Articles of incorporation for Spirit were filed with the Tennessee Secretary of State on April 12, 2007, and Mr. King executed the bill of sale, which specifically incorporated the terms of the asset purchase agreement, on behalf of Spirit. CCC was notified of the change and did not object. And the board of directors and the stockholders of both CCC and Spirit ratified and adopted the asset purchase agreement.

In sum, the chancery court applied the correct legal principals and its assessment of the evidence was not clearly erroneous. Under the facts as found by court, the application of the clean hands doctrine was not unreasonable. As such, we conclude that the chancery court did not abuse its discretion in applying the doctrine to bar recovery of Spirit's promissory note.

## B. REMAINING ISSUES

CCC and Mr. Armes also take issue with the chancery court's interpretation of the subordination agreement and calculation of interest on the promissory note. Our conclusion that the chancery court did not abuse its discretion in dismissing CCC's counterclaim renders review of these issues unnecessary.

## III. CONCLUSION

For the foregoing reasons, we affirm the decision of the chancery court.

_____
W. NEAL MCBRAYER, JUDGE

13