IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 19, 2005 Session

**JERRY LYNN SWIFT v. GALE JOANN (RITCHIE) SWIFT**

**Appeal from the Chancery Court for Stewart County**
**No. 02-11-001     Robert E. Burch, Judge**

——————————————

**No. M2004-01501-COA-R3-CV - Filed December 27, 2005**

——————————————

This appeal involves the division of property upon divorce where there existed a valid Antenuptial Agreement that included provisions governing such distribution. Because we find that the trial court's distribution was consistent with the terms of the agreement and supported by the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

Jerry W. Hamlin, Ashland City, Tennessee, for the appellant, Gale Joann Swift.

Mark A. Rassas, Julia P. North, Clarksville, Tennessee, for the appellee, Jerry Lynn Swift.

**OPINION**

Jerry Lynn Swift and Gale Joann Ritchie Swift were married September 26, 1997. It was his second marriage and her seventh. They had known each other for a few years and had lived together for some time before the marriage. Mr. Swift had been in the logging business in Stewart County for many years, and he continued that business throughout the marriage. Ms. Swift did some part-time work for Mr. Swift's logging business both before and after the marriage.

The day before their marriage the parties entered into an Antenuptial Agreement. The lists of assets exchanged as part of the agreement's execution show that Ms. Swift owned about $25,000 in household and personal goods, while Mr. Swift owned business assets including land, timber, and equipment, as well as other assets, all totaling over $1,000,000.

On September 12, 2002, Mr. Swift filed a complaint for divorce. In an agreed bifurcated proceeding, the trial court first determined the validity of the Antenuptial Agreement. The trial court ruled on the agreement was enforceable and binding.

The parties stipulated as to grounds for divorce, and they were declared divorced. Trial was held on the distribution of marital property. The trial court identified the property it deemed marital and awarded some tracts of real property and sixteen horses to Mr. Swift along with all other property in his possession. The court awarded Ms. Swift a 2000 Lincoln automobile, personal items, and half of household items. The court also ordered Mr. Swift to pay a balance of approximately $9,330 in credit card debt incurred by Ms. Swift after the parties' separation.

Ms. Swift has appealed from the final order distributing the property. Without going into more detail about the basis of her appeal at this point, suffice it to say that she thinks she should have gotten more property.

## I. THE ANTENUPTIAL AGREEMENT

Ms. Swift does not appeal the trial court's ruling that the Antenuptial Agreement is valid and enforceable. Consequently, any review of the distribution of property must begin with the relevant portions of that document:

> The parties agree that in the unfortunate circumstances that proceedings are brought for absolute divorce, divorce from bed and board, for separate maintenance or any other domestic remedy, then regardless of which party is granted relief, and regardless of fault, they will be bound by the terms of this Agreement and seek no other recourse from any Court. In such event the parties agree that:
>
> (A)    Separate Property.
>
> All Separate Property, as defined in this Agreement, including the appreciation and income thereof, will remain the Separate Property of the respective parties. Each party agrees he or she will assert no claim of any type or kind to such Separate Property of the other.
>
> (B)    Joint Property.
>
> All Joint Property will be divided so that each party receives one-half of the property or proceeds, if owned in equal shares, or receive the appropriate ownership share, if owned differently. If any party has contributed to the jointly held property with his or her Separate Property, he or she shall be credited with the value of that property before the Joint Property, or the proceeds thereof, are divided.

Antenuptial agreements are valid and enforceable in this state as long as they are entered into freely, knowingly, and without duress or undue influence. *Perkinson v. Perkinson*, 802 S.W.2d 600, 603 (Tenn. 1990). Specific statutory authority exists for, and courts are bound by, an antenuptial agreement concerning property owned by either or both spouses before marriage. Tenn. Code Ann. § 36-3-501. Additionally, parties may agree prior to marriage on the division at divorce of property acquired during the marriage. Tenn. Code Ann. § 36-4-121(g); *Perkinson*, 802 S.W.2d at 603. Courts are specifically authorized to incorporate such agreements on the division of property into a divorce decree. Tenn. Code Ann. § 36-4-121(g). Where an antenuptial agreement is valid and enforceable, having been shown to meet the prerequisites, the terms of that agreement regarding distribution of property upon divorce will be applied instead of the statutory definitions of marital and separate property or general principles regarding an equitable distribution. *Perkinson*, 802 S.W.2d at 603-04.

Because the trial court's holding that the Antenuptial Agreement between the parties was enforceable has not been appealed, our task is to enforce the terms of the agreement in light of the facts in the record. Antenuptial agreements are treated as any other contract, *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993). Consequently, the general rules regarding contract interpretation apply.

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Id.*; *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). "The intent of the parties is presumed to be that specifically expressed in the body of the contract . . . ." *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes; but, where a contractual provision is ambiguous, *i.e.*, susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Planters Gin Co.*, 78 S.W.3d at 890. In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. *Id.* However, a strained construction may not be placed on the language used by the parties to find or create ambiguity where none exists. *Id.* at 891.

The question of interpretation of a contract is a question of law. *Guiliano*, 995 S.W.2d at 95. Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Id.*; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct.

App. 2000). This court must review the documents ourselves and make our own determination regarding their meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

Ms. Swift's objection to the trial court's distribution of the parties' assets deals with property acquired after the marriage. In the Antenuptial Agreement, the parties contemplated that some property acquired during the marriage would be jointly owned. They agreed as to how such joint property would be distributed if they divorced. In pertinent part, the Agreement provides that each party would receive one half of the property or proceeds from the property, but that the one-half division would apply only to the value remaining after subtraction of the value of either party's separately owned property that was contributed toward the joint property.

## II. THE TRIAL COURT'S DIVISION OF PROPERTY

Well before trial Mr. Swift filed a List of Property Subject to Division, in which he itemized property he deemed joint property under the Antenuptial Agreement as well as making claims for reimbursement for certain items.[1] Closer to trial, he amended the list to reflect changed values due to market changes. The property he identified as joint included four (4) lots in Holiday Shores, a fifteen-acre tract of land identified as Leatherwood Pasture, and sixteen horses. He included a list of household items and equipment that he valued at $2,525. It was Mr. Swift's position that all the joint or marital property listed was purchased solely with his separate money or property, and he later testified to that. Consequently, he asserted, the property should be divided according to Paragraph 7(B) of the Antenuptial Agreement: his initial contribution to acquire the property should be subtracted from the current value and any remainder divided equally. The values he assigned were, in almost all cases, no greater than the original cost.

Ms. Swift did not, prior to trial, dispute the list supplied by her husband or submit a list of her own. At trial she presented and testified about a list of household items, including equipment, appliances, and furnishings that she wanted in the property division. Mr. Swift was given the opportunity to review the list, and he marked those items he disputed should be awarded to her. Ms. Swift then testified about the marked items. Some she said belonged to her before the marriage; some were gifts; and some she acknowledged were jointly acquired during the marriage. She also sometimes set values as to particular items.

At the close of the hearing, the trial court directed that Mr. Swift divide the disputed property into two lists and that Ms. Swift choose one of the lists. In the final order, the court awarded Ms. Swift all the undisputed property shown on the list she submitted at trial and "the items set out on one of the two lists submitted to her, through counsel. The specific list shall be filed with this court."

---

[1] He claimed in that filing and at trial that the *pendente lite* support he paid under court order should be credited to him since the Antenuptial Agreement provided that neither party would be entitled to any support. He also asked that certain credit card debt be assigned solely to his wife.

Neither party appeals the trial court's division of the household property or the method used. Generally, however, this court is required to review the trial court's overall distribution of property, including classification and valuation determinations, in order to provide appropriate appellate review of the trial court's duty to make an equitable division of marital property, but only marital property. As to the disputed household items, the trial court made no classification or valuation findings. The record before us does not include the final list of items awarded to Ms. Swift, as the court ordered. Neither party has submitted a Tenn. R. Ct. App. 7 tabulation of the property. Under this record, it is impossible to determine what the overall distribution of marital property was. In many cases, that would require remand for specific findings.

In this case, however, our task is not to determine whether the trial court made an equitable distribution of the marital estate. Instead, the questions before us are whether the property was correctly identified as joint property under the Antenuptial Agreement and, if so, whether it was distributed in accordance with the relevant provisions of that Agreement. We review the trial court's findings of fact *de novo,* with a presumption of the correctness of the factual findings of the trial court, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). Since neither party has directed us to any perceived error in either the trial court's determination that certain property was "joint property" under the agreement or in the trial court's distribution of that property as to any of the household items appearing on any of the lists submitted, we must assume those items were correctly awarded.

The next set of items acknowledged by Mr. Swift as marital property are the horses. Mr. Swift provided a list of the horses with the purchase price and current value of each reflected. Prior to trial, he amended the values and testified the value of the horses had decreased in the past few months. He also presented a witness who had bought and sold horses in the area for many years and who had sold Mr. Swift most or all of the horses at issue. The witness verified the amended values and testified as to the recent decrease in values, especially for brood mares. The total purchase price paid was $39,150, and the current value was $28,200.[2] Mr. Swift testified he had purchased all of the horses at issue with his separate funds. Ms. Swift disputed that to some degree, asserting that she went with him to purchase some of the horses and that some of her money was also used in the purchase price. Under the Antenuptial Agreement, Ms. Swift would be entitled to one-half the value of the horses that exceeded the original amount of separate property contributed by Mr. Swift. Although the trial court did not specifically find that Mr. Swift's separate property was used to purchase the horses, that conclusion could be implied, and the evidence supports that conclusion. In any event, Ms. Swift does not contest the award of the horses to Mr. Swift or point to any error in any particular decision by the trial court regarding the horses.

At the time of the divorce, the parties held joint title to four lots in Holiday Shores which had been logged and to one fifteen acre parcel of pasture known as the Leatherwood Property. Although the Holiday Shores lots had not appreciated in value since the purchase, Mr. Swift disclosed that the

---

[2]Additionally, Mr. Swift had paid all expenses for care and feeding of the horses during the approximately eighteen months between the parties' separation and the trial, which he calculated at $128 per day.

basis of the lots had been reduced by $1,000 by the logging. Because he claims the lots were purchased solely with his separate assets, he claims that only the $1,000 is subject to equal distribution under the Antenuptial Agreement.

The Leatherwood property was originally a forty-acre tract, but all but fifteen acres had been sold during the marriage. Mr. Swift testified he purchased the property with his separate funds, but that it was jointly held. Through the sale of parts of the original tract, he had recovered his original investment. He acknowledged that the value of the remaining parcel was joint property subject to equal division under the Antenuptial Agreement and valued the remaining tract at $22,500.

Thus, according to Mr. Swift, the joint property subject to equal division under the Antenuptial Agreement totaled $23,500 at the time of the divorce. Accordingly, each party would be entitled to $11,750. However, Mr. Swift also argues that Ms. Swift's share must be offset by the value of the Lincoln Town Car she was awarded even though it titled solely in his name. He also asserts that the credit card debt assigned to him but incurred by her should be considered in the equation as well as the $6,600 in *pendente lite* support he paid that was not authorized by the Antenuptial Agreement.

Ms. Swift valued the Lincoln at $11,000 to $14,000 and testified that Mr. Swift brought the car to her to use after their separation since she had no other mode of transportation. Mr. Swift argues she depreciated the car by putting excessive mileage on it during her possession of it.[3]

Mr. Swift argues the trial court's division of property was more than equitable. Even though he does not directly challenge the court's division, he argues that it resulted in Ms. Swift receiving more than she was entitled to under the Antenuptial Agreement. Ms. Swift does not directly dispute the court's decisions regarding the specific property and debts covered by the order.

The trial court apparently accepted Mr. Swift's itemization and valuation of joint property. Our review of the evidence supports the same conclusion. However, the trial court awarded all the land to Mr. Swift, and the value of that joint property, applying the Antenuptial Agreement's methodology, is $23,500. He was also required to pay $9,330.35 in credit card debt that the court found was attributable to charges incurred following the parties' separation.[4] Ms. Swift was awarded the Lincoln automobile, which we must assume the trial court treated as marital or joint property.

---

[3] The proof indicates the car was driven 38,000 miles while she had it.

[4] Although Mr. Swift argues that the debt he was required to assume should be credited in his favor in consideration of the property division, he does not directly challenge the trial court's allocation of that debt to him. We do not need to consider whether that allocation was appropriate. However, we note that the Antenuptial Agreement provides that each party shall be responsible for debts he or she contracted during the marriage and shall indemnify the other for the payment of such debt. Since the Antenuptial Agreement deals with apportionment of debt upon divorce, it would apply rather than general principles regarding the identification and allocation of marital debt.

Under the Antenuptial Agreement, the only property subject to equal distribution was the value of any joint property owned at the time of divorce after subtraction of either party's contribution to acquisition of the assets from his or her separate property. Because Mr. Swift set that amount at $23, 500 for the land, and Ms. Swift offered no countervailing evidence, we accept that amount. Because the court treated the Lincoln as joint property, its value, as determined by the Antenuptial Agreement's provisions, should have been included. There is little evidence from which to determine that amount. However, the evidence supports a finding that Mr. Swift bought the car with his separate funds and that it was paid for by the time of the divorce. It is reasonable to conclude that its value has decreased since its purchase. Consequently, there is no amount to be divided between the parties.

Under the Antenuptial Agreement, Ms. Swift was entitled to one-half of the $23,500 identified as by Mr. Swift, or $11, 750. She was awarded property worth, according to her testimony, between $11,000 and $14,000. We conclude that the trial court's division of the specified property was consistent with the parties' agreement as evidenced in the provisions of the Antenuptial Agreement.

### III. MS. SWIFT'S ARGUMENT

Ms. Swift's objection to the trial court's division of property does not relate to the specific assets described above that were owned at the time of the divorce. Instead, her argument is more general.

As stated earlier, Mr. Swift was in the logging business for more than twenty years before he married Ms. Swift and continued in that business during the marriage. As part of that business, Mr. Swift frequently bought land with standing timber, cut the timber, had it sawn into lumber, sold the lumber, and then resold the land. The intent in purchasing land was to re-sell it quickly after timber was removed. He made many such transactions during the course of the marriage, and in some situations had the land titled in both his and Ms. Swift's names.[5] In those cases, Ms. Swift signed the documents transferring the land to the new buyers upon re-sale. Ms. Swift testified about a few of these jointly-held properties. Her position was that "her" share of profits, if any, from the sales was used to purchase other property. Essentially, she believed that the money that continued to be used in sequential transactions was half hers.

The proceeds from the land sales were deposited into Mr. Swift's business account.[6] Similarly, proceeds from the sale of timber logged off those tracts were also deposited in that account. The business paid Ms. Swift $200 per week both before and during the marriage for her

---

[5] He also bought numerous parcels in his name only, and there was no real explanation of why some were titled jointly and some separately.

[6] There were also references to another joint personal account, and Mr. Swift testified that the business paid Ms. Swift every week and also paid him, all out of the business account. It is difficult to determine precisely what accounts the parties are referring to or what was paid out of each. Nonetheless, a general pattern was shown.

part-time work. She maintained a personal checking account and, although at some time she added Mr. Swift's name to that account, he never wrote any checks or made other withdrawals on it. There was no testimony or other evidence as to the amounts at the time of the hearing in any of the accounts referred to.

Ms. Swift testified that it was not possible for her to give the court a number or value of what she was entitled to. She has not been more specific on appeal.[7] Her arguments are subject to several interpretations.

If Ms. Swift's position is interpreted as an argument that she acquired some interest in the business or its profits, we find no support for that argument in either the Antenuptial Agreement or the facts in the record. Under the Antenuptial Agreement, Mr. Swift's premarital business assets remained his separate property, as did any income from those assets. The Agreement cannot be read to give Ms. Swift any interest in the business or its profits, even if those profits were income generated during the marriage. Ms. Swift did not dispute that the tracts of land she testified about were bought for use in the business. Further, Ms. Swift did not prove the value of the business, while Mr. Swift produced tax returns showing a decline in profits during the marriage.

Another way to interpret Ms. Swift's argument is that she is entitled to a share of the profits, if any, generated by land titled in both names, even though the land was no longer owned by the parties at the time of the divorce.[8] In opening statements, that is the argument made by her attorney. Essentially, he argued that when profits were made on land titled in both names, those profits were marital property, but that Mr. Swift deposited those profits into his business account and used them to invest in some other property. The attorney stated that evidence relevant to the acquisition of assets and use of the proceeds from the sale of joint property would be presented. "What did they earn off of those assets, off of that joint investment? Was his initial investment under the agreement repaid? And, then, what happened with the profits?"

However, the attorney also acknowledged that, although he had been provided with voluminous records from Mr. Swift's business, it was impossible to reconstruct the transactions in precise detail without testimony from an accountant, which he did not have. Counsel requested that the court refer the financial matters to a special master with accounting skills to trace all the assets acquired and disposed of during the marriage.[9] The court did not then appoint a special master, but rather took proof. In its final order, the trial court stated it did not believe a special master could

---

[7]She requests that the case be remanded with instruction that the trial court include as marital property "all property purchased in the names of both parties as well as all assets coming into the personal business account of the husband" and that the court make a more even distribution of that marital estate.

[8]The tracts Ms. Swift testified about were not owned by the parties at the time of the divorce and not subject to division under either the Antenuptial Agreement or the statutes that would otherwise apply.

[9]In arguing the need for testimony from other witnesses who had not been served with subpeonas, counsel stated he was not asking for a continuance because the matter had already been delayed and his client needed to get the divorce.

specifically determine any profit received from any sales of property that had been held in joint names because of the manner of operation of the business and, consequently, appointment of a master would not be beneficial, "particularly since it had not been asked for previously, the first time it was requested was during the trial in this cause."

Ms. Swift simply did not prove that profits were actually generated from the sale any particular tracts of land that were titled jointly. The trial court found that Ms. Swift's "claims for interest in property that was acquired in joint names during the marriage, the majority of which had previously been disposed of, only considered gross values and did not include costs and expenses of business operations and therefore her values and claims were not supported in fact." The evidence does not preponderate against this finding that Ms. Swift failed to prove any profits were generated from jointly titled property. Additionally, she did not prove how any such profits were used, whether they still existed, or tie them to any subsequent transaction. There was similarly no proof as to the value of Mr. Swift's business, the balance in his business or other accounts, or the value of any other property he owned at divorce. Consequently, this argument fails for lack of proof.

On appeal, Ms. Swift argues most strongly that Mr. Swift's treatment of his separate property and the parties' joint property resulted in commingling of those assets and transmutation of his separate property, his business account specifically, into martial property subject to an equitable division. She argues that proceeds from the sale of joint property were deposited in Mr. Swift's business account or in the marital account and that family expenses were paid from both accounts. Ms. Swift argues that this commingling of marital property with separate property resulted in the transmutation of both accounts into marital property.

Not only does this argument suffer from the same lack of specific proof that any profits were generated from jointly-held property, it is also inconsistent with the Antenuptial Agreement. While the Agreement recognizes that the parties might acquire "joint property," it also anticipates that "joint property" may be owned in different shares. Any "joint property" held at divorce is to be divided according to the appropriate ownership shares, but only after each party is credited with any contribution from separate property made toward the jointly held property. These provisions are in direct contradiction to the concepts of commingling and transmutation. The Antenuptial Agreement established the methodology for division of property acquired during the marriage, and that is the methodology that must be applied.

## IV. CONCLUSION

The trial court's division of property was consistent with the terms of the Antenuptial Agreement and with the evidence in the record and is, therefore, affirmed. We note that even if the usual rules of property division were applied, based on the record before us, we could affirm the division ordered by the court. This was a marriage of relatively short duration, and the parties were returned to essentially the same relative financial position they enjoyed prior to the marriage. Throughout the marriage, Mr. Swift provided the financial support for the couple, paid or contributed to the costs of Ms. Swift's custody battle with a former husband, paid or contributed to child support

she owed, and provided financial support to members of her family. Ms. Swift's only income was the $200 per week she received from Mr. Swift's company. The parties spent during the marriage for mutual benefit, and there is no proof regarding exactly how much they owned at divorce.

The judgment of the trial court is affirmed. Costs of this appeal are taxed to the appellant, Gale Joann Swift.

_____

PATRICIA J. COTTRELL, JUDGE