IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 18, 2004 Session

## JAMES A. DRAKE, JR. v. JPS ELASTOMERICS CORP.

**Appeal from the Chancery Court for Shelby County**
**No. 99-0589-3    D.J. Alissandratos, Chancellor**

_____

**No. W2003-01579-COA-R3-CV - Filed August 23, 2004**

_____

This case involves the breach of an employment compensation contract. Under the sales employee's compensation plan with his employer, he was to earn extra commission for any sales that exceeded his annual quota. In the compensation plan, the employer reserved the right to pay only the standard commission on "windfall" sales. For the fiscal year at issue, the sales employee exceeded his quota. The employer invoked the windfall provision of his compensation plan and paid him only the standard commission on the sales over his quota. The sales employee sued his employer, arguing that he was entitled to the extra commission on the sales over his quota. On cross-motions for summary judgment, the judge ruled in favor of the plaintiff sales employee. On appeal, the defendant employer argues that the "windfall provision" applies to all sales that were unbudgeted or unforecast and that the plaintiff sales employee's excess sales fall in that category. We hold that the defendant employer's interpretation conflicts with the plain meaning of the contract, and affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Keith D. Frazier and Jonathan O. Harris, Nashville, Tennessee, for the Appellant, JPS Elastomerics Corporation.

Larry K. Scroggs, Memphis, Tennessee, for the Appellee, James A. Drake, Jr.

### OPINION

Plaintiff/Appellee, James A. Drake, Jr. ("Drake"), was employed as a district sales manager for Defendant/Appellant, JPS Elastomerics Corp. ("JPS"), from 1995 until 1999, selling roofing products. Drake's sales territory included Kansas, Missouri, Oklahoma, Arkansas, Mississippi, northern Louisiana, and portions of Kentucky and Tennessee.

Drake was paid a base salary plus a commission. The commission was calculated according to a Sales Incentive Plan, prepared by JPS each year. Under the Sales Incentive Plan, Drake was to be paid commissions of 0.75% on net sales up to his annual sales quota. For net sales in excess of his annual sales quota, the Plan provided that Drake would receive a commission of 3.0%. Each year, Drake prepared a list of customers he intended to target in the coming year, as well as a sales quota for those customers. The list of targeted customers and the quota figures were then transmitted to the national sales manager who gave the final approval, usually after consultation with his own superiors.

In 1997, for the first time, Drake's Sales Incentive Plan included a "windfall provision" which said: "Management reserves the right to determine that windfalls be eligible for only the lower rate of commission and not the excess over quota." The contract did not define "windfall." In the Sales Incentive Plan, JPS reserved the right "to determine plan eligibility, remove representatives from coverage, and modify or terminate the Plan at its discretion." Drake's quota was $4,324,549. Drake's list of customers included:

| Customer | Quota |
|---|---|
| McGaughey Lumber | $1,490,500. |
| Performance Mtls. | $1,031,678. |
| Roofers Supply & Service | $592,172. |
| Nashville Distribution (TBA) | $467,701. |
| Spec Roofing | $242,915. |
| Distribution | $3,824,966. |
| DC Taylor | $468,611. |
| Target Stores | $30,972. |
| Direct | $499,583. |
| | $4,324,549. |

The sales at issue in this litigation were from Hollis Roofing Company. It is undisputed that Hollis Roofing Company, as such, was not included in Drake's 1997 list of targeted customers.

The parties stipulated that, beginning in 1995 and continuing through 1998, Drake established contacts with Hollis Roofing. He frequently called Hollis, set up personal meetings, and even held product demonstrations for Wal-Mart, with whom Hollis did significant business. JPS admits that it was aware of Drake's pursuit of business from Hollis Roofing during this time.

In 1996, Drake began to receive sales from Hollis Roofing through Hollis Roofing's distributor, McGaughey Lumber Company. These sales were listed under McGaughey Lumber Company rather than Hollis Roofing, because McGaughey was a distributor on JPS's approved list. For fiscal year 1996, Drake received the increased commission rate, 3.0%, for his sales in excess of his quota. Drake's 1996 Sales Incentive Plan did not include a windfall provision, which was inserted into the Sales Incentive Plan the following year.

In 1997, Hollis Roofing was not included on Drake's list of targeted customers, since sales were still required to be made through the approved distributor, McGaughey. In August 1997, JPS authorized Drake to sell its roofing products directly to Hollis Roofing, rather than through McGaughey.

In fiscal year 1997, Drake generated total sales in 1997 of $6,856,773.99, exceeding his quota by $2,532,224.99. Drake did just over $2.5 million ($2,541,387.42) in business with Hollis, some of it through McGauhey Lumber until August of 1997 when he began to sell to Hollis directly.

In late 1997, Drake learned that JPS had decided to invoke the windfall provision of the Sales Incentive Plan with respect to his sales to Hollis and pay him only the 0.75% standard commission. Had Drake been paid under the 3% increased commission rate, his commission would have been $56,975 more. Drake then filed this lawsuit against JPS, asserting that JPS's application of the windfall provision constituted a breach of contract.

In the trial court below, virtually all of the pertinent underlying facts were stipulated or were otherwise undisputed. After discovery was completed, both parties filed cross-motions for summary judgment, and the trial court held a hearing on both motions. The issue for the trial court was one of contract interpretation, namely, whether the windfall provision of Drake's 1997 Sales Incentive Plan was applicable to the over $2.5 million in sales to Hollis Roofing in fiscal year 1997.

JPS emphasized to the trial court that it was undisputed that Drake did not include Hollis Roofing on his 1997 list of potential customers and that *no* sales to Hollis Roofing were budgeted in Drake's 1997 quota. The president of JPS, Bruce Wilby, testified in his deposition that the windfall provision was intended to apply to such a situation, where there was a significant volume of "greatly underforecasted" sales:

> The sales incentive plan has the clause in there for – and there's a number of situations that could come up that would invoke it, but the ones that come to mind to me are an unbudgeted or an unforecasted or greatly underforecasted volume for a customer or a customer who was never on the list.

Thomas Gallivan, national sales manager of JPS who gave final approval of the quota figures, offered a similar explanation:

> And if the business is there or the potential for the business is there, it should be considered or taken into consideration when the budgets are developed. And the windfall clause is there to prevent what one might call sandbagging or under forecasting or under budgeting.

Drake, of course, noted that Hollis Roofing was not included on his 1997 list of potential customers because, at the time the list was generated, JPS required that Drake's sales to Hollis Roofing be made through JPS's approved distributor, McGaughey Lumber, and that JPS did not approve direct sales

to Hollis Roofing until some ten months into fiscal year 1997. Drake also pointed out that it was undisputed that JPS was well aware of Drake's efforts to secure sales from Hollis Roofing as early as 1995. Indeed, Drake was paid the increased commission rate of 3.0% for his sales in 1996 which exceeded his quota, including sales to Hollis Roofing made through the distributor, McGaughey Lumber.

At the conclusion of the hearing on the parties' cross-motions for summary judgment, the trial court found that the windfall provision was not applicable. The trial court stated:

> The definition of windfall is, in the absence of the parties giving me a definition, which they did not, is that which reasonable men and women would give. It's called a reasonable person test under the law. In fact, it's not as though windfall is something that is novel to the law. It is truly that which is unexpected without effort.

The trial court rejected JPS's application of the windfall provision to the undisputed facts in this case:

> It is not a windfall, however, when, by the admission and the stipulation, we have the plaintiff working Hollis Roofing Company knowing that they're a major contractor with Wal-Mart, which we have the plaintiff having personal meetings, telephonic contacts, giving demonstrations with the architect with Wal-Mart about meeting specifications. This is what people like the plaintiff are hired to do.

Thus, the trial court denied JPS's motion for summary judgment and granted summary judgment to Drake. Drake was awarded $56,975, along with pre- and post-judgment interest. From this order, JPS now appeals.

Summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to summary judgment as a matter of law. Rule 56.04 of the Tennessee Rules of Civil Procedure. As all of the material facts are not in dispute, the only issue on appeal is one of contract interpretation. Contract interpretation is a matter of law, and is reviewed on appeal de novo with no presumption of correctness from the trial court below. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn.1999). "When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Id.*

It is undisputed that JPS drafted the Sales Incentive Plan at issue in this case. It is a well-settled principle of contract interpretation that language used in a contract, where ambiguous, will be construed most strongly against the party who has used it. *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. App. 1996). In addition, we must interpret the contract in a way that gives effect to every term, so far as is reasonable, and avoids internal conflicts. *Id.*

-4-

As noted above, because the contract provides no definition, we look for the natural and ordinary meaning of the term "windfall." The term originated in medieval England where commoners could not chop down trees for fuel, but they were free to gather the timber blown down by the wind, or "windfall." It came to mean any unexpected piece of good luck. *See* Eric Kades, *Windfall*, 108 Yale L. J.1489 (1999). Contemporary usage tends to emphasize the unearned or undeserved nature of windfalls. Thus, Black's Law Dictionary offers the definition, "An unanticipated benefit, usu. in the form of a profit and not caused by the recipient." Black's 1594 (7th ed. 1999).

In this appeal, JPS reiterates the same arguments it made to the trial court. It maintains steadfastly that Drake did not include Hollis Roofing on his 1997 list of potential customers. It does not dispute, however, that when Drake's 1997 list of customers was submitted, sales to Hollis Roofing were required to be routed through McGaughey Lumber. Moreover, JPS does not even attempt to feign surprise at Drake's sales to Hollis, given its knowledge of his extensive sales efforts and the fact that he was compensated for sales to Hollis, through McGaughey, in 1996.

JPS also continues to argue that the windfall provision should be applied to sales which are "unbudgeted and unforecast." JPS , of course, had the opportunity to define the term "windfall" in this manner in the 1997 Plan but failed to do so. The meaning of windfall argued by JPS plainly conflicts with the provision, in the 1997 Plan and the prior Sales Incentive Plans, that provides for a commission at an increased rate of 3.0% on net sales in excess of the annual sales quota. If indeed the windfall provision applied to all sales which were "unbudgeted and unforecast," *no* sales would qualify for the 3.0% commission. JPS responds by arguing that "windfall" sales are only those that *far* exceed the quota, while sales that exceed the quota by a small amount could earn the incentive commission. This interpretation, however, appears to have nothing to do with the meaning of the term "windfall" and everything to do with JPS's reluctance to pay Drake the agreed-upon commission rate for earning sales in excess of his quota. The natural and ordinary meaning of the windfall provision is clearly the meaning ascribed to it by the trial court. Utilizing this interpretation, the windfall provision has no application to the facts of this case. Therefore, we affirm the trial court's denial of JPS's motion for summary judgment, and its grant of summary judgment in favor of Drake.

The decision of the trial court is affirmed, and all costs are assessed to the Appellant, JPS Elastomerics Corp., for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, J.