**DIRECT GENERAL INSURANCE COMPANY, Plaintiff–Appellant,**

**v.**

**INDIAN HARBOR INSURANCE COMPANY, Defendant,**

Houston Casualty Company, National Specialty Insurance Company, Defendants–Appellees.

No. 15-14887

Non-Argument Calendar

United States Court of Appeals, Eleventh Circuit.

Date Filed: 09/29/2016

Warren W. Harris, Bracewell LLP, Houston, TX, Dylan Cook Black, Bradley Arant Boult Cummings, LLP, Birmingham, AL, Steven W. Davis, Boies Schiller & Flexner, LLP, Miami, FL, Katherine J. Henry, Bradley Arant Boult Cummings, LLP, Washington, DC, Jeffrey L. Oldham, Bracewell LLP, Houston, TX, Edmund Scott Sauer, Thor Y. Urness, Bradley Arant Boult Cummings, LLP, Nashville, TN, for Plaintiff–Appellant

Ira Scott Bergman, Mound Cotton Wollan & Greengrass, Fort Lauderdale, FL, Alexander R. Karam, Douglas M. Mangel, Shipman & Goodwin, LLP, Washington, DC, Mark K. Ostrowski, Shipman & Goodwin, LLP, Hartford, CT, Lionel F. Rivera, Mound Cotton Wollan & Greengrass, Fort Lauderdale, FL, for Defendant–Appellee Houston Casualty Company

Steven J. Brodie, Daniel Gonzalo Enriquez, Jason Patrick Kairalla, Thomas John Meeks, Carlton Fields Jorden Burt, PA, Miami, FL, Gwynne Alice Young, Carlton Fields Jorden Burt, PA, Tampa, FL, for Defendant–Appellee National Specialty Insurance Company

Before MARTIN, JORDAN, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Appellant Direct General Insurance Company ("Direct") is a Tennessee insurer that issues automobile policies providing personal injury protection ("PIP") benefits under Florida law. Direct alleges that Appellees Houston Casualty Company and National Specialty Insurance Company (the "Excess Carriers") breached the terms of insurance policies that were in force for the 2008–2009 policy year. The district court granted summary judgment in favor of the Excess Carriers. After careful review, we affirm.

## I.

### A.

Direct seeks coverage under a program of insurance plans issued for the March 30, 2008 to March 30, 2009 policy year (the "policy"). This program consists of: (1) a $10 million primary policy issued by Indian Harbor,[1] which is subject to a self-insured retention of $1 million per Claim; (2) a first excess policy issued by Houston Casualty that provides an additional $10 million limit of liability; and (3) a second excess policy issued by National Specialty that provides $10 million of additional coverage in excess of the underlying $20 million. The Indian Harbor primary policy states the terms and conditions for coverage, which are incorporated into the excess policies unless otherwise provided.

The policy provides "claims-made" coverage, which means that a Claim must have been made during the policy's term in order to trigger coverage. The policy covers "Loss from Claims first made against the Insured during the Policy Period ... for Wrongful Acts." The policy also contains a provision stating that "[a]ll Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made or when the earliest of such Related Claims is treated as having been made ..., whichever is earlier." Related Claims are defined as "all Claims for Wrongful Acts based on or directly or

---

1. In August 2015, Indian Harbor settled with Direct and was dismissed from this action.

indirectly arising out of or resulting from the same or related ... series of facts, circumstances, situations, transactions, or events."

In turn, the policy also defines a Claim for Wrongful Acts as including "any civil proceeding" and any "written demand or notice to an Insured indicating that a person or entity intends to hold an Insured responsible for a Wrongful Act." The term Wrongful Act includes "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary or other duty committed by an Insured in rendering, or in failing to render, Professional Services." As relevant to the definition of a Wrongful Act, the term Professional Services means "services performed by the Insurance Company ... for a policyholder, customer or client of the Insurance Company ... performed for monetary consideration pursuant to a policy of insurance."

## B.

Before 2008, the Florida PIP statute permitted Direct to reimburse certain medical providers for 80 percent of "reasonable expenses" (the "Reasonable Amount Method"). See Fla. Stat. § 627.736(1)(a) (2007). When the statute was reenacted in 2008, it gave insurers the option of calculating benefits using an alternative method based on a fee schedule (the "Fee Schedule Method"). See id. § 637.736(5)(a)(f) (2008). Direct began applying the Fee Schedule Method to PIP benefit payments for all losses that occurred after the statute's January 1, 2008 effective date. Soon after making this switch, Direct began receiving statutory demand letters alleging that it had not paid the full amount of benefits owed and threatening to sue for full payment. Direct seeks coverage for tens of thousands of statutory demand letters and lawsuits al-

leging that it did not pay the proper amount of these PIP benefits. Direct alleges that it paid approximately $62 million to settle the claims, and an additional $10.3 million in defense costs.

## C.

On June 19, 2008, Advantage Open MRI filed a class action against Direct General in Florida state court (the "Advantage Action"). Although Advantage MRI's initial complaint generally alleged underpayment of PIP benefits, its second amended complaint specifically alleged that Direct's usage of the Fee Schedule Method was unlawful. In January 2009, which was within the coverage period, Direct gave notice to the Excess Carriers of a proposed amended complaint in the Advantage Action. Ultimately, the Advantage Action was voluntarily dismissed.

On September 11, 2012, MRI Associates of St. Pete filed a class action against Direct in Florida state court (the "St. Pete Action"). The St. Pete Action explicitly contended that its class of MRI providers was underpaid because Direct used the Fee Schedule Method rather than the Reasonable Amount Method. Direct gave notice of the St. Pete Action to the Excess Carriers on October 8, 2012. Even though the St. Pete Action was filed long after the expiration of the coverage period, the Excess Carriers accepted both that action and the Advantage Action for coverage under a reservation of rights. The Excess Carriers accepted the St. Pete Action because they acknowledged that the Advantage and St. Pete Actions were Related Claims and thus constituted a single Claim under the 2008–2009 policy.

On January 3, 2014, the Excess Carriers received a spreadsheet from Direct that listed more than 70,000 claims for which Direct sought coverage under the 2008–2009 policy. The earliest claims listed were

dated April 3, 2008, just after the policy became effective. In a letter accompanying the spreadsheet, Direct stated that, per the Related. Claims provision, the "demands and complaints on the spreadsheet ... are based on or directly or indirectly arising out of or resulting from the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events as the [Advantage and St. Pete Actions] and therefore are related claims falling within the same 2008–2009 policy period."

During discovery, Direct identified and produced 34 PIP demands ("Pre–Policy Demands") it acknowledged receiving between January 1, 2008 and March 30, 2008. Direct received these demands after the Florida PIP statute's reenactment, but before the policy coverage period began. Unlike the claims listed in the spreadsheet, Direct asserted that the Pre–Policy Demands were not Claims for Wrongful Acts. In a letter dated October 30, 2014, Direct stated that, "[w]hile the class actions and subsequent lawsuits assert that [Direct] committed a Wrongful Act by paying PIP Claims pursuant to the Fee Schedule Method rather than the Reasonable Amount Method, the [Pre–Policy] [D]emands do not assert that [Direct] committed this Wrongful Act."

## II.

We review the grant of summary judgment de novo. Arawak Aviation, Inc. v. Indem. Ins. Co. of N. Am., 285 F.3d 954, 956 (11th Cir. 2002). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Tennessee law, which all parties agree applies here, insurance policy interpretation is a question of law. Gui-

liano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999).

## A.

The crux of this appeal is whether the Pre–Policy Demands are Related Claims "based on or directly or indirectly arising out of or resulting from the same or related ... series of facts, circumstances, situations, transactions, or events" as the Advantage Action, the St. Pete Action, and the claims listed on the Notice Spreadsheet. The Excess Carriers argue that the Pre–Policy Demands are Related Claims such that all the claims must be "treated as a single Claim" made before the 2008–2009 coverage period. If the Pre–Policy Demands are related, then all the claims for which Direct seeks coverage would fall outside the policy period. Direct argues that Pre–Policy Demands are not related because they do not all implicate the same legal theory—namely, that Direct underpaid PIP benefits using the Fee Schedule Method rather than the Reasonable Amount Method. Direct has coined this legal theory the "Permissive Methodology Theory." Instead, Direct says the Pre–Policy Demands are merely routine demands for payment unrelated to the claims for which it seeks coverage.

The district court did not err in granting summary judgment to the Excess Carriers. As the district court pointed out, the policy "does not define Related Claims by whether the separate claims present the same legal theory." Instead, the policy defines Related Claims as "all Claims for Wrongful Acts based on or directly or indirectly arising out of or resulting from the same or related ... series of facts, circumstances, situations, transactions, or events." Direct itself relied on this broad definition to argue that the Advantage Action, the St. Pete Action, and the over 70,000 demands and complaints listed on

the notice spreadsheet were one Related Claim covered by the 2008–2009 policy.[2] A number of the Claims on the Notice Spreadsheet are identical, save for the names of the claimants and amounts at issue, to three of the Pre–Policy Demands. And twenty-eight of the Pre–Policy Demands share the same claim number as one or more of the claims listed on the Notice Spreadsheet.[3] If Direct's characterization of Related Claims on the Notice Spreadsheet is taken at face value, then these Pre–Policy Demands must also be related.

The district court identified even more direct links between the Pre–Policy Demands and certain claims for which Direct seeks coverage. One Pre–Policy Demand resulted in a lawsuit (the "Altamonte Suit") against Direct that was filed during the 2008–2009 coverage period. The Altamonte Suit and its corresponding Pre–Policy Demand "involve the same claimant, same medical provider, same accident and same services." In fact, Direct listed the Altamonte Suit on the Notice Spreadsheet and attached it to its first amended complaint as an "exemplar" Related Claim. Similarly, one of the Pre–Policy Demands,

a letter that Direct received from Health & Well Being Therapy, "involved the same claimant, same medical provider and same services as two later demand letters listed on the Notice Spreadsheet." Direct cannot say that certain claims are related in order to establish coverage and then exclude indistinguishable claims made prior to the 2008–2009 coverage period that would foreclose coverage.[4]

### B.

Direct makes several alternative arguments as to why the district court erred in considering the Pre–Policy Demands. First, Direct argues that the district court adopted a "limitless interpretation" that "render[s] illusory Direct['s] coverage for all PIP-related claims." This argument has no merit. As the Excess Carriers point out, the district court's interpretation is precisely the same as the broad interpretation advanced by Direct when it wanted to group the class actions and over 70,000 demands into one Related Claim. Beyond that, the district court did not find that all PIP claims are automatically related; rather, it found that claims alleging that Direct

---

2. The policy also refers to Claims for Wrongful Acts, which are defined as including "error, ... or breach of ... duty committed by an Insured in rendering, or in failing to render, Professional Services." Professional Services are "services performed by the Insurance Company ... for a policyholder ... for monetary consideration pursuant to a policy of insurance." Said another way, a Wrongful Act includes an error committed by Direct in performing a service for policyholders for monetary consideration. This definition easily encompasses claims that Direct made a payment error under its automobile insurance policies. A claimant may allege that Direct made a payment error without invoking the Permissive Methodology Theory.

3. Each claim number corresponds with a separate automobile accident, meaning that these Pre–Policy Demands arise from the same

"series of facts" as claims identified by Direct as related.

4. Direct also argues that fact issues preclude summary judgment because a dispute exists as to whether the Pre–Policy Demands are "routine demand[s] for payment" or "professional liability claims." However, the question of whether certain claims are related is a matter of contract interpretation and thus a legal issue. Beyond that, as the district court found, even assuming that some fact issues exist, the undisputed facts support the conclusion that the Pre–Policy Demands are related. As the district court noted, it "need[ed] only [to] find one [Pre–Policy Demand] that is related to the other Related Claims to find that the universe of Related Claims is to be deemed made prior to the inception of the Policy."

miscalculated PIP benefits after the reenactment of the PIP statute are related. This interpretation does not eliminate coverage for claims unrelated to Direct's alleged misinterpretation of its statutory obligations.

Second, Direct argues that the term "Related Claims" is ambiguous and that any ambiguity should be read in favor of Direct, the policyholder. Direct says that the definition of "Related Claims" is ambiguous because it is inconsistent with two other contract terms, the Pending and Prior Litigation Endorsement clause and the Notice provision. We find no conflict between the Related Claims definition and these clauses. The Pending and Prior Litigation Endorsement says that "[n]o coverage will be available ... [for claims] brought on or before: October 21, 1983." The Pre–Policy Demands were unquestionably first made after October 21, 1983. Therefore, whether those Pre–Policy claims are related to the later policy claims has nothing to do with the Prior and Pending Litigation Endorsement.

As for the Notice provision, Direct argues that it demonstrates the difference between "professional liability claims" and "routine payment demands" like the Pre–Policy Demands. Specifically, Direct says that the Notice provision "requires that [a] senior manager [ ] make a determination of the claim or demand as being a professional liability claim." The Notice provision includes no such requirement. Instead it provides, in relevant part:

> As a condition precedent to any right to payment in respect of any Claim, the Insured must give the Insurer written notice of such Claim, ... in no event later than sixty (60) days after the end of the Policy Period. A Claim is first made when an Insured first receives notice of the filing of a complaint ... or when an Insured first receives the written demand or notice that constitutes a Claim....

This provision demands notice for all claims, not just "professional liability" claims. This provision does not create any ambiguity with respect to the Related Claims analysis, which does not hinge on Direct's Permissive Methodology Theory.

Finally, Direct argues that the district court applied a "sophisticated insured" exception that is contrary to Tennessee law. Direct asks that we certify a question to the Tennessee Supreme Court asking whether "Tennessee law would recognize an exception for sophisticated insureds, or whether Tennessee law requires insurance policies to be construed in accordance with an insured's reasonable expectations." The district court did not apply any "sophisticated insured" exception; rather, the district court referred to Direct's sophistication in explaining why Direct should be held to the unambiguous terms of the policy. There is no need to certify a question in these circumstances. We affirm the district court's grant of summary judgment.[5]

**AFFIRMED.**

---

**5.** The Excess Carriers raise two alternative grounds for affirming. Because we affirm for the reasons articulated by the district court, we do not address these alternative arguments.