# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 16, 2018 Session

## JEFFERSON COUNTY SCHOOLS v. TENNESSEE RISK MANAGEMENT TRUST, ET AL.

### Appeal from the Chancery Court for Jefferson County
### No. 14-CV-120      Ben W. Hooper, II, Judge

### No. E2017-01346-COA-R3-CV

In this appeal concerning insurance coverage, Jefferson County Schools ("Plaintiff") sued its insurers, Tennessee Risk Management Trust and Travelers Indemnity Company ("Defendants"), in the Chancery Court for Jefferson County ("the Trial Court"). Building 8 at Jefferson County High School collapsed during a rainstorm. The Tennessee State Fire Marshal's Office ordered Plaintiff to implement repairs to prevent a future collapse of both the damaged and undamaged portions. Plaintiff asserted that, pursuant to an "ordinance or law" provision in its insurance policy, Defendants were responsible for coverage for additional work in undamaged portions of Building 8 in order to comply with the Fire Marshal's directive. Defendants argue in response that the additional work was discretionary and went beyond what the insurance policy covered. After a hearing, the Trial Court entered judgment in favor of Defendants. Plaintiff appeals. We hold that the Fire Marshal's directive, issued under that office's authority, qualified as an "ordinance or law." Defendants were, therefore, required to cover the additional work.[1] We reverse the judgment of the Trial Court and remand for determination and entry of a monetary judgment in favor of Plaintiff.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

Albert J. Harb and Bart C. Williams, Knoxville, Tennessee, for the appellant, Jefferson County Schools.

---

[1] Tennessee Risk Management Trust, while a party on appeal, no longer is actively involved in this litigation. We refer to the defendants collectively for convenience.

Russell E. Reviere and Jonathan D. Stewart, Jackson, Tennessee, for the appellees, Tennessee Risk Management Trust and the Travelers Indemnity Company.

## OPINION

### Background

On July 7, 2013, a major rainstorm occurred in Jefferson County. A portion of Building 8, an aging vocational building at Jefferson County High School, collapsed. No one was present at the time. Building 8 was covered through Tennessee Risk Management up to $100,000 less a $500 deductible. Excess claims were covered by Travelers Indemnity Company. The insurance policy contained an "ordinance or law" provision providing for coverage of expenses "caused by the enforcement of any ordinance or law." The policy provided as relevant:

> **f. Ordinance or Law**
> If a Covered Cause of Loss occurs to Covered Property, the Company will pay for:
> (1) **The loss to the undamaged portion of a covered building** caused by the enforcement of any ordinance or law that:
> (a) Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;
> (b) Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the Insured's premises; and
> (c) Is in force at the time of loss.
> The most the Company will pay for loss or damage under this portion of Ordinance or Law is the Limit of Insurance specified for Ordinance or Law — Undamaged Portion shown in the Supplemental Coverage Declarations.
>
> ***
>
> (3) **The increased cost to repair, rebuild or construct the Covered Property** caused by enforcement of building, zoning, land use or any other ordinance or law when the Covered Property is insured for replacement cost. If the covered building is repaired or rebuilt, it must be intended for similar occupancy as the current building, unless otherwise required by zoning or land use ordinance or law.

-2-

The Company will not pay for increased construction costs until the Covered Property is actually repaired or replaced, at the same location or elsewhere; and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage but not to exceed 2 years. The Company may extend this period in writing during the 2 years.

The most the Company will pay for loss or damage under this portion of Ordinance or Law is the increased cost of construction repair or replacement:
(a) Of a building of the same size and at the same premises, or another premises if required by the ordinance or law, and
(b) Limited to the minimum requirements of such ordinance or law regulating the repair or reconstruction of the damaged property on the same site. not to exceed the Limit of Insurance specified for Ordinance or Law—Increased Cost of Construction shown in the Supplemental Coverage Declarations.

***

## D. EXCLUSIONS
1. The company will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

***

## h. ORDINANCE OR LAW
The enforcement of any ordinance or law:
(1) Regulating the construction, use or repair of any property; or
(2) Requiring the tearing down of any property, including the cost of removing its debris;

except as provided in the Covered Costs and Expenses, item B.2.f.

Ordinance or Law

The Ordinance or Law exclusion applies whether the loss results from an ordinance or law that is enforced even if the property has not been damaged; or from the increased costs incurred to comply with an ordinance

or law in the course of construction, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

On July 8, 2013, David Pittman with the Tennessee State Fire Marshal's Office issued a directive to school officials stating in part that "[a] structural engineer will need to evaluate the remaining structure of the vocational building to ensure that the structural integrity of the remaining building is in adequate condition and future collapses will not occur." Plaintiff did that. Expensive work ensued. Travelers paid for reconstruction of the collapsed portion of Building 8, as well as certain additional work in the rest of the building. In all, Travelers paid out over $900,000 on the claim. However, disagreements arose as to coverage beyond this point. The engineer of record, Carl Taylor, retained by Plaintiff as directed by the Fire Marshal determined that compliance with the Fire Marshal's directive required vertical reinforcement of the remainder of Building 8. Mark Buchanan, Defendants' engineer, opined that additional reinforcement on the remainder of Building 8 went beyond what was necessary. Travelers declined to pay for this additional work.

In October 2014, Plaintiff sued Defendants in the Trial Court. Plaintiff argues that, pursuant to the "ordinance or law" provision of the insurance policy, Defendants are responsible for the additional work undertaken in order to comply with the Fire Marshal's directive. For their part, Defendants contend that they already have fulfilled their responsibilities under the insurance policy, and that their paying for the additional work would result in an undue windfall for Plaintiff.

This case was tried without a jury in June 2017. The most pertinent testimony came from the sides' respective engineers, Carl Taylor and Mark Buchanan.

Carl Taylor, Plaintiff's engineer, testified in part as follows:

Q. Alright. Now, when you were looking around Building-8 in its collapsed state in terms of your trying to comply with that directive, and we've already marked it, I don't need to keep plowing new ground so to speak, but what was it about that Building-8 that was of concern to you in terms of a structural evaluation? Let's talk about the walls, the height of the halls, all the different factors, just talk to the Judge about that.
A. Well, you are correct, the walls were one concern because of their height.
Q. Do you remember how high --
A. And the slenderness. No, I do not, but they're relatively tall walls. We looked at how the bar joists were anchored to the walls, where it had fallen you had access to the actual joists, and the joist-bearing were not adequate.

-4-

Q. Both in the collapsed area and the non-collapsed?
A. Yes.
THE COURT: The joist-bearings?
A. Yes, where the bar joists rest on the wall, how they're anchored. And so we did that on, I believe the 10th, and on the 11th I believe we went up in a lift and I tried to look at the other portions of the building at the joist-anchorage, looked for any distress that was obvious to the naked eye in the building.

***

Q. Okay. Would this building be, in terms of a classification, a sound building, fragile building? Do you understand what I'm asking? And you're looking at it from a structural-engineering standpoint.
A. It would be a building that I would consider to be in impossible distress. And then after reviewing the existing drawings, to see the fact that the walls are not reinforced or anything else, I would have to at least consider it to be deficient, given that there had been a collapse.
Q. Alright. Now, you said that you looked at the original drawings and they weren't reinforced, what do you mean by reinforcement?
A. There was not any reinforcing steel in the block walls, any vertical reinforcement.
Q. And would you normally combine concrete in conjunction with that steel --
A. Yes.
Q. -- to solidify that joint?
A. Right, yes sir.
Q. What's the effect of that, especially on a building like this that's just collapsed, what would that do to this building?
A. It would reduce greatly any possible distress or concerns with it. Concrete block and brick have no strength when it comes to bending. When you have wind loads or something like on the wall and the wall bends, mortar has almost no strength. It's like concrete is not strong in tension, when you try to bend it concrete's not strong. So you have reinforcing steel to take those loads, to hold the elements of the block wall together.
Q. Alright. So the process of filling these block walls with concrete and rebar is designed to cure that problem?
A. Yes.
Q. Now, let's take a quick look, if we could, at the Fire Marshal's directive, which has been marked as Exhibit 3A. We've got two different

-5-

ones, one is easier to read, so look at 3A. And in particular, I'd ask you to look at the last paragraph on the second page, 1-of-2, do you see that?

A. Yes.

Q. This was the directive, "A structural engineer will need to evaluate the remaining structure of the vocational building to ensure that the structural integrity of the remaining building is in adequate condition and future collapses will not occur." Was that the charge as you understood it, sir?

A. That is the charge, but I must say that one cannot state that there will be no future collapses.

Q. Alright. So your duty was to satisfy the State Fire Marshal's Office as best you could?

A. As their intent of it being in adequate condition and that someone would sign off to say it is safe to be occupied.

Q. And that someone would be?

A. Me, under the circumstances.

Mark Buchanan, Defendants' engineer, testified in part as follows:

Q. Alright. After you were able to determine what the mechanism of failure was, in your professional opinion, was that failure caused by the lack of reinforcement in the masonry in that wall?

A. No, sir.

Q. Explain that to the Court.

A. Alright, so we have gravity loads which are vertical, they're created from gravity. And we have lateral loads, wind loads, earthquakes, anything that pushes on the side of the building. Masonry is very, very strong under compression, gravity loads.

Q. Explain what you just said when you said masonry is very strong under compression.

A. So if we have a concrete block and we try to push on the top of it, it's very strong in that direction. Gravity, down-force. If we try to bend a block wall like wind blowing on wall, it goes into bending. Just like a piece of paper, if I take this piece and apply force here, it bends. So, when I do this, this exterior face of the wall on this side goes into tension, it's trying to pull itself apart, the inside is in compression. So when that masonry wall is built and is under pure gravity loads, is 100% pushing down, there's no tension in the wall. I have never seen a masonry wall fail in compression, I've seen them fail in shear, which is very unique, I've seen them fail in flexure multiple times, but never in compression. So just the pure weight of the water pushing down on the joists, loading the wall, would not have created any failures on this building whatsoever.

-6-

Q. And how certain of that are you?
A. 100%.

***

Q. And in the end result, Mr. Buchanan -- again, not looking at it through the lens of what an insurance company paid or not paid -- did you interpret what had to be done as you would regardless of whether an insurance company had hired you or Jefferson County had hired you?
A. It doesn't matter who I work for.
Q. Let me do it this way: If Jefferson County after this collapse had said we want to hire you to give us advice of what we have to do and need to do structurally to fix this, get it approved by the Fire Marshal, but make sure we have a structurally-sound building, to put kids and people like your parents in, teachers and all the people that work in and out of that building, would your plans have been any different than scenario A ones we looked at? Would that change what your professional opinion was about how to address this and fix it?
A. If they had come to me as a client, I would sit down with them and explain the different scenarios. You can't have reinforcement? You don't have to have reinforcement. It's a good idea, it's an expensive idea. Is it safe without it? It meets the code. I would explain that and have them make an informed decision. I call this the golden rule, the person with the gold gets to make the rule. I don't care if they reinforce their block or not, my only objective is to meet the minimum standards of the code that I'm given in order to provide a safe environment for whoever's in the building. Now, that's not to say that reinforcing block is a bad idea, it's not. I designed a facility for Arnold Engineering for 350 mile-an-hour winds, there has never been 350 mile-an-hour winds tracked on the interior of the United States of America. And I pointed that out to them. And their answer was, pardon my French, "We don't give a s---, that's what we want you to [do]." And that's what I did. They had the gold, they made the rule, I complied. In this particular case, the code says what I did is exactly spot on. There's no doubt in my mind I did the right thing.
Q. And was that the same thing you would've done in 2008, 2009, 2011?
A. Whenever. Today.
Q. So, to be very clear, is there any question in your mind about what you -- and it was you telling Travelers, right? [Y]ou were the one making this judgment, they were using you?
A. I'm the one that was responsible for that, yes sir.

-7-

Q. Any doubt in your mind that what you ultimately showed to the Court and the drawings you just explained, complied in every respect with what the 2006 IBC code said had to be done?
A. Structurally, that's a correct statement.
Q. Without any doubt?
A. No doubt.

Evidence at trial reflected $575,955.93 as the cost for the disputed additional work.

In June 2017, the Trial Court entered its final judgment, finding in favor of Defendants. The Trial Court found and held as follows:

> With the request for a jury trial being waived, this case came on for hearing on June 7 and 8, 2017, before the Court. A review of the file shows a complaint for declaratory judgment based on a significant rain event occurring July 7, 2013, and causing the partial collapse of the roof of Building 8 and structural damage to the building.
>
> The issue from the court files presented the question of whether or not certain repairs required to put Building 8 in compliance with the "Standards and Codes" was a covered loss under the policy. (Exhibit # 21). This issue was then agreed upon by the parties that the rain event of July 7, 2013, was in fact a Covered Cause Loss and the policy was a Replacement Cost Policy. The part of the policy that must be construed by the Court is found under Section B.(2)(f), page 6 of the Property Coverage Form attached hereto and being a page from Exhibit 21. As stated in the plaintiff's written argument (Plaintiff's Statement of Facts and Conclusions) "the analysis of this claim, therefore, must depend upon whether the facts of this case provide coverage under the above cited provisions".
>
> Tennessee Risk Management Trust is no longer involved in this litigation. To conduct this analysis requires looking at every exhibit filed and admitted, all the evidence introduced, and the written arguments of counsel. The parties did provide some relief to the Court by stipulating that:
>
> a. The Tennessee State Fire Marshal's Office (TSFMO) is empowered to adopt building codes for the State of Tennessee.
> b. At the time of the loss, the building codes adopted by the TSFMO and that were in effect were the 2006 International Building Code (2006 IBC), as well as the 2003 National Fire Protection Association 101 (2003 NFPA 101).

c. The TSFMO has exclusive jurisdiction of the enforcement of these codes as they apply to schools.

There was a collapsed portion of Building 8 that created no dispute and was paid for by the defendant, Travelers. In addition, Travelers noted a problem of no bar joist ties into the walls, and they repaired and paid for this work even though it was in the uncollapsed portion of Building 8. Their work, also included a whole new roof and scuppers for overflow water, plus providing $170,000 to accommodate the needs of the shop which had been damaged.

It was here that the generosity of Travelers came to an end and they refused to cover and pay for the reinforcement of the masonry walls in the uncollapsed portion of Building 8.

The Court will not go into detail about all the evidence offered, other than to say there was a lot and that all of it is important except for the fact that the first bridge to cross is whether or not this claim can survive the language of the policy of insurance. The Court finds that it cannot. The court will state the defendant's witness, Mike Buchanan was found to be very knowledgeable and credible and his testimony was given substantial weight. Section (f). Ordinance or Law says:

"If a Covered Cause of Loss occurs to Covered Property, the Company will pay for:
(1) The loss to the undamaged portion of a covered building caused by the enforcement of any ordinance or law that:"

Considering this portion of the policy, and keeping in mind that the word "undamaged" is used, whereas during the trial of this case it was usually referred to as "uncollapsed", it can be seen that there must be a loss caused by the enforcement of any ordinance or law. The plaintiff, having this burden, has failed. There has been no showing of a code violation (ordinance or law). The fire marshal's directive set out no code violation, nor can one be found anywhere in the evidence of this case as to the undamaged or uncollapsed portion of Building 8. If the Court is wrong, then the first subsection under (1) is "(a) Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;". This condition has certainly not been met by the evidence. There is no coverage under the policy of insurance. Plaintiff's claim is dismissed with costs to the plaintiff. Lastly, do not assume for one moment that the brevity of this Judgment is any indication of the amount of time it has taken this Court to come to this conclusion.

Plaintiff timely appealed to this Court.

## Discussion

We restate and consolidate the issues Plaintiff raises on appeal into the following dispositive issue: (1) whether the Trial Court erred in holding that Defendants did not provide coverage for and, therefore, were not responsible for the additional work performed throughout Building 8.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

"In general, courts should construe insurance contracts in the same manner as any other contract." *American Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000). In interpreting the policy, this Court's task is to determine the intention of the parties, and view the "[t]he language of the policy . . . in its plain, ordinary and popular sense." *Id.; Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Accordingly, this Court has held:

> [an insurance policy] should not be given a forced, unnatural or unreasonable construction which would extend or restrict the policy beyond what is fairly within its terms, or which would lead to an absurd conclusion or render the policy nonsensical and ineffective.

*Dixon v. Gunter*, 636 S.W.2d 437, 441 (Tenn. Ct. App. 1982) (citing 44 C.J.S. *Insurance* § 296); *see also Demontbreun v. CNA Ins. Co.*, 822 S.W.2d 619, 621 (Tenn. Ct. App. 1991) (holding that an insurance policy should not be construed to extend "coverage beyond its intended scope"). This Court has a "duty to enforce contracts according to their plain terms[,]" and we are "precluded from creating a new contract for the parties." *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

Defendants argue that the Fire Marshal's directive, lacking as it was in any citations to specific code violations, fails to constitute an "ordinance or law" for purposes of coverage under the insurance policy. As stated by the Trial Court in its final judgment,

the parties in this case stipulated to the following with respect to the Fire Marshal's authority:

> a. The Tennessee State Fire Marshal's Office (TSFMO) is empowered to adopt building codes for the State of Tennessee.
> b. At the time of the loss, the building codes adopted by the TSFMO and that were in effect were the 2006 International Building Code (2006 IBC), as well as the 2003 National Fire Protection Association 101 (2003 NFPA 101).
> c. The TSFMO has exclusive jurisdiction of the enforcement of these codes as they apply to schools.

Given these stipulations, we can see no way that the Fire Marshal's directive could be construed as merely discretionary rather than having the force of law. Plaintiff had to comply with the Fire Marshal's directive before it could use a repaired Building 8.

Defendants, in their brief on appeal, acknowledge the Fire Marshal has the power to "to force compliance with specific portions of the International Building Code that would be enforcement of an ordinance or law" but that "Plaintiff has not shown enforcement of any such provisions" and "[t]he existence of the power alone is not enforcement of an ordinance or law." Respectfully, the Fire Marshal exercised this power when the directive was issued to Plaintiff. A review of relevant 2006 IBC provisions is illuminating. Under Section 115.1 the 2006 International Building Code, "Unsafe structures shall be taken down and removed or made safe, as the building official deems necessary and as provided for in this section." Section 506.2.1 of the International Existing Building Code states: "Regardless of the extent of structural damage, dangerous conditions shall be eliminated." Section 110.1 of the 2006 IBC provides further: "No building or structure shall be used or occupied, and no change in the existing occupancy classification of a building or structure or portion thereof shall be made until the building official has issued a certificate of occupancy therefor as provided herein." While the Fire Marshal's directive did not cite these specific provisions, there is no question that the Fire Marshal had the authority to enforce these code provisions. Additionally, there is no question this is exactly what the Fire Marshal did when it directed the school officials to retain a structural engineer to "evaluate the remaining structure of the vocational building to ensure that the structural integrity of the remaining building is in adequate condition and future collapses will not occur."

In a case from the Fifth Circuit United States Court of Appeals, the court discussed the building officials' authority and affirmed in part the district court's ruling in a factually analogous case:

-11-

HSIC next asserts that the Ordinance does not require demolition or regulate repair as required by the Policy but merely gives discretion to the building officials. Section 116.1 of the Ordinance provides that "[u]nsafe structures shall be taken down and removed or made safe, as the *building official* deems necessary." This language mandates the removal *or* repair of unsafe structures. HSIC, however, points out that, though there were five previous fires at the Property, the building official did not mandate a re-design of the flex duct work until the December 2012 fire. This does not change our conclusion. The Lafayette Consolidated Government (the "City") did not adopt the Ordinance until 2011, and the five previous fires all occurred between 1997 and 2010. Even if the building official's prior lack of action was sufficient to preclude coverage under Section 2.f.(1), the Ordinance was not in effect at the time of the earlier fires.

HSIC also asserts that the correspondence between City officials and Meadows West's management shows that the Ordinance did not "require demolition" or "regulate repair." We disagree. In his January 18, 2013, letter (the "January 18 Letter") to Nevils, Manuel threatened to resort to legal action. Further, though the January 18 Letter does not specifically cite any ordinance or law, Manuel again corresponded with Nevils on April 12, 2013 (the "April 12 Letter"). In the April 12 Letter, Manuel explicitly stated that he was authorized by law to take necessary steps to "resolve this problem [of potential fire hazards] under [Section 116], which has been adopted by the Lafayette Consolidated Government." Manuel issued a repair deadline of September 30, 2013, and informed Nevils that he would disrupt the power to all of the unrepaired units if the repairs referenced in the January 18 Letter were not completed. Taken together, the January 18 Letter and the April 12 Letter indicate that Manuel "deemed [the Property] an unsafe condition" and "specifie [d] the required repairs or improvements to be made to abate the unsafe condition ... within a stipulated time" as required by the Ordinance.

Finally, Meadows West was required by City officials to reconfigure the flex duct work. Manuel identified the flex duct work as a fire hazard and instructed that it be removed and repaired. Following this determination, Manuel: (1) requested that Meadows West hire a Louisiana licensed contractor; (2) instructed Meadows West to have the repair drawn and designed by a mechanical engineer; and (3) suggested acceptable repairs. While Manuel did not mandate a specific type of repair aside from the removal of the flex duct work, the repair plans still had to be approved by the Planning, Zoning, and Codes Department, and the repair itself was

subject to inspection by the fire marshal. Thus, Meadows West was required, by law and through the application of the Ordinance, to remove and replace the flex duct work, triggering the Ordinance or Law Provision.

*Houston Specialty Ins. Co. v. Meadows West Condo Ass'n*, 640 Fed. Appx. 267, 272-73 (5th Cir. 2016).

In the present case, the Fire Marshal's directive ordered school officials to retain a structural engineer to "evaluate the remaining structure of the vocational building to ensure that the structural integrity of the remaining building is in adequate condition and future collapses will not occur." Plaintiff complied with the Fire Marshal's directive, as it was required to do. Plaintiff's engineer, Carl Taylor, determined that reinforcement of the walls in the non-collapsed parts of Building 8 was required in order to comply with the Fire Marshal's directive. With respect to Buchanan, an experienced engineer, his opinion that the additional work was unnecessary does not negate that of the engineer of record retained by Plaintiff in accordance with the Fire Marshal's directive to ensure the structural integrity of the remaining building. The Trial Court found Buchanan credible. While we afford great deference to a trial court's credibility determinations, the credibility determination here is beside the point as it was not and is not relevant to the issue as stated by the Trial Court of "whether or not this claim can survive the language of the policy of insurance." This language of the policy referred to by the Trial Court is the "ordinance or law" provision.

As directed by the Fire Marshal, it was incumbent upon Plaintiff to retain an engineer and submit repair plans for official approval, which they did. Defendants have failed to identify how the Fire Marshal's office exceeded its authority. We are not unmindful of Defendants' concerns regarding the limits to their responsibility under the policy, which is not open-ended. However, we hold that it was the Fire Marshal's authority under then existing Tennessee law to issue the directive it did. It was this directive that triggered the "ordinance or law" provision of the insurance policy.

Building 8 was a covered property under the insurance policy. There was, indisputably, a covered cause of loss. The Fire Marshal's directive carried the force of law and Plaintiff had to obey it if it wished to re-occupy Building 8. Mr. Pittman of the Tennessee State Fire Marshal's Office issued a directive that required the Plaintiff to retain a structural engineer to "evaluate the remaining structure of the vocational building to ensure that the structural integrity of the remaining building is in adequate condition and future collapses will not occur." Plaintiff was required to comply with this directive if it wished to occupy the building. Plaintiff, in compliance with the Fire Marshal's directive, retained Carl Taylor as the engineer of record. It was Mr. Taylor's determination, as the engineer of record retained pursuant to the State Fire Marshal's

directive, that compliance with the Fire Marshal's directive required the additional work in dispute. Plaintiff had no choice but to comply with the Fire Marshal's directive if it wished to occupy the building. Plaintiff's adherence to the Fire Marshal's directive resulted in increased costs and, therefore, fell under the ambit of the replacement cost policy.

We hold that, under the terms of the insurance policy and the evidence presented in this case, Defendants are responsible for covering the cost of the additional work necessary to comply with the Fire Marshal's directive. We, therefore, reverse the judgment of the Trial Court. We remand this case for the Trial Court to determine the amount of the monetary judgment in favor of Plaintiff and to enter a judgment for that amount.

## Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellees, Tennessee Risk Management Trust and the Travelers Indemnity Company.

_____
D. MICHAEL SWINEY, CHIEF JUDGE